## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| ERICA PARKS and DANIEL T. DURGIN, on behalf of themselves and and others similarly situated, c/o DannLaw PO Box 6031040 Cleveland, OH 44103 | ) ) ) ) ) ) ) | Case No. 1:21-cv-258 |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| vs. | ) **)** | |
| THE PROCTER & GAMBLE COMPANY, c/o CT Corporation System, Reg. Agent 4400 Easton Commons Way, Suite 125 Columbus, OH 43219 | ) ) ) ) ) | |
| Defendant. | ) ) | |

Plaintiffs Erica Parks and Daniel T. Durgin, ("Plaintiffs") bring this Class Action against The Procter & Gamble Company ("Defendant", "Procter & Gamble", or "Crest"[1] herein), on behalf of themselves and all others similarly situated, and allege the following based on their personal knowledge and the investigation of their counsel:

## I. INTRODUCTION

1. This is a consumer Class Action against Defendant, a multinational consumer goods corporation that owns a number of brands, including Crest, an oral care company, for its false advertising, unfair and deceptive marketing practices, negligent misrepresentations and

---

[1] In this Complaint, Plaintiffs will largely refer to Defendant as "Crest", but will specify they are referring to its parent company, Procter & Gamble, as necessary. For purposes of this Complaint, "Crest" and "Procter & Gamble" are used interchangeably.

materially misleading claims and omissions it negligently employed and disseminated in connection with the sale its line of dental products containing activated charcoal.

2.      Activated charcoal is highly porous and has adsorptive qualities that can be useful in certain contexts. In recent years, health and beauty products containing activated charcoal have become a consumer sensation. Opportunistic marketers, celebrities and social media influencers tout a variety of activated charcoal products for purported detoxifying properties and other enhanced wellbeing and health benefits. Consumers have been willing to pay a premium for these charcoal products based on these purported benefits.

3.      Procter & Gamble is the parent company of Crest, which sells oral care products containing activated charcoal, including the following products: Crest 3D White Whitening Therapy Toothpaste – Charcoal, Crest 3DWhite Toothpaste Charcoal with Hemp Seed Oil, Crest Gum Detoxify Charcoal Toothpaste, Crest Gum and Sensitivity Charcoal Toothpaste, Crest 3D White, Whitening Toothpaste Charcoal, Brilliance Charcoal Toothpaste, Crest 3D White Whitening Therapy with Ginger Oil, and Crest 3D White Whitening Therapy with Tea Tree Oil. Hereinafter, these products as well as any other Crest toothpastes containing activated charcoal that have been available for purchase within the relevant statute(s) of limitations, will be referred to collectively herein as the "**Charcoal Toothpastes**." Additionally, at times when relevant to the allegations herein, Charcoal Toothpastes containing fluoride are referred to as the "**Fluoride Charcoal Toothpastes**" and those that are fluoride-free are referred to as the "**Fluoride-Free Charcoal Toothpastes**." Both subsets are otherwise subsumed in the term "Charcoal Toothpastes".

4.      Crest promotes the Charcoal Toothpastes as whitening, cleansing, gentle, detoxifying, penetrating, enamel-safe, and cavity-fighting. Multiple claims are printed on the

product packaging and tube labels of the Charcoal Toothpastes, including: "Up to 100% Surface Stain Removal in 5 Days", "Deeply Cleans and Removes Stains", and "Enamel Safe Whitening". In its extensive online marketing and print advertising, Crest makes the same and similar claims of whitening effects, detoxifying properties, gentleness, and other benefits of its Charcoal Toothpastes.

5.      Crest, a household brand name established in 1955, also promotes itself as a brand to be trusted and relied upon by consumers in connection with their decision-making as to oral health and dental hygiene maintenance. Crest's ubiquitous marketing content conveys a clear message that the brand is extremely conscientious and focused on health and safety, and possessive of the oral healthcare expertise to develop its Charcoal Toothpastes.

6.      Any success experienced by Crest with regard to the Charcoal Toothpastes sold has been built around messaging that is materially misleading and deceptive to consumers, lacks a factual basis, and negligently and recklessly omits material information concerning the use of charcoal in oral care.

7.      Crest had duties to uphold as to its marketing, advertising and labeling of the Charcoal Toothpastes, and the oral care products it develops, markets, and sells are subject to legal and regulatory frameworks for cosmetics and over-the-counter drugs.[2] For example, the Federal Trade Commission ("FTC") requires that marketers such as Crest ensure that advertising claims are truthful, not misleading, and supported by a reasonable basis and to do so before disseminating such claims. The Food and Drug Administration ("FDA") prohibits the misbranding of products such as the Charcoal Toothpastes, which are deemed misbranded if false or misleading in any particular. They can also be deemed misbranded if certain claims

---

[2]      Each of the Charcoal Toothpastes qualify as a cosmetic or a combination of cosmetic and over-the-counter drug, under the pertinent legal framework, as explained *infra*.

conveyed lack the requisite competent and reliable scientific evidence to substantiate them. Federal law and agency regulations, as well as certain state consumer protection laws that mirror the same, clearly provide for a standard of care and various obligations as to transparency, truthfulness, disclosures and substantiation of the health, safety and efficacy claims for products that qualify as cosmetics, over-the-counter drugs, or a combination of the two.

8.      A consensus of respected dentists, researchers and industry experts weighs *against* the use of charcoal dentifrices,[3] due to the lack of scientific substantiation on safety and efficacy, as well as risks of harm. For example, in 2017, findings published in the Journal of the American Dental Association (JADA) concluded that there is insufficient laboratory or clinical data to substantiate the safety and efficacy of dentifrices containing activated charcoal, and cautioned against its use. In 2019 the British Dental Journal (BDJ) again confirmed a lack of substantiation in the form of sound and reliable scientific studies. The 2019 BDJ article expressed concern that charcoal toothpastes are a "marketing gimmick" that could, in fact, cause harm to oral health, structures, and aesthetics. Many qualified dental professionals have also spoken out on these findings and other safety, therapeutic and cosmetic concerns, and have cautioned against the use of charcoal dentifrices. Dr. Ada Cooper, a spokesperson for the American Dental Association, recently commented on the lack of safety substantiation (and reported hazards) for charcoal dentifrices and stated: "Just because something is popular doesn't mean it's safe."[4]

9.      Notably, the American Dental Association ("ADA") has not approved *any* charcoal dentifrices for its ADA Seal of Acceptance (the "ADA Seal"). The ADA Seal certifies the safety and efficacy of a dentifrice, based on clinical data and research.

---

[3]      "Dentifrice" is a term for tooth-cleansing pastes and powders.
[4]      "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/]. (emphasis added).

10.     Crest's product packaging and marketing of the Charcoal Toothpastes includes materially misleading representations and omissions that they are likely to deceive (and did deceive) reasonable consumers. For example, rather than 'whitening' teeth and lifting stains, the Charcoal Toothpastes actually abrade tooth enamel. Crest also omitted material facts, including that charcoal, when used in a dentifrice is known to be abrasive to enamel and the gums, and to pose risky safety hazards with use. Additionally, it may in fact be detrimental and harmful to oral health and aesthetics. Crest failed to disclose that scientific literature counter-indicates the safety and efficacy of charcoal in oral care use.  It failed to disclose its lack of safety substantiation, despite a duty to do so. Through its omissions as well as by affirmative misrepresentations, Crest actively mislead consumers to believe the product was gentler than other whitening toothpastes, and superior to other similar products sold by competitors, and also that Crest had the credibility to back up all of its claims.

11.     The information conveyed was material and concerned unique and intrinsic qualities of activated charcoal and of the products (including whitening, stain-lifting, and other benefits, as well as safety and efficacy for dental hygiene and oral health maintenance), and it caused an increase in consumers' perception of their value, level of safety, and superiority to other oral care products on the market.

12.     Crest charges a $1 to $2 price premium for the Charcoal Toothpastes over Crest's other toothpastes that do not contain charcoal.

13.     Crest was, and remains, uniquely situated to evaluate the safety of its products and the veracity of its ubiquitous claims of gentleness, whitening, stain-lifting, and other properties of the Charcoal Toothpastes, which were materially misleading, deceptive, or false and lacking in requisite substantiation. Crest nonetheless aggressively proceeded with its

5

opportunistic marketing campaign, claiming to be conscientious and trustworthy on its Charcoal Toothpastes in order to secure consumer confidence, while negligently and recklessly making false, misleading, unsubstantiated, or impossible claims on its benefits and properties. To the current day, Crest continues its negligent and false advertising campaign to induce consumer reliance and purchase, without regard to the consequences to the deceived consumer.

14.     As a direct and proximate result of Crest's negligent marketing, material misrepresentations and omissions, and deceptive practices in its advertising and labeling, Plaintiffs and others similarly situated have suffered injury in fact and ascertainable losses from their purchase of one or more of the Charcoal Toothpastes, and did not receive the full value of their purchase. Crest successfully induced Plaintiffs and the putative class members to purchase the Charcoal Toothpastes that: (i) cannot and do not perform by whitening and stain-lifting; (ii) are not gentle as represented; (iii) do not meet basic oral hygiene needs that other, less expensive dentifrices would; and (iv) may in fact be detrimental and harmful to oral health and aesthetics. Furthermore, some consumers have experienced the extreme negative effects that activated charcoal can cause, including discoloration of the gumline, gum irritation, excessive abrasion of tooth enamel and dentin, yellowing of the teeth, and damage to dental implants.[5]

15.     By falsely advertising and misbranding its Charcoal Toothpastes, Crest prioritizes its own profits and jeopardizes consumers' dental hygiene, oral health and safety. Crest's conduct in its advertising, labeling, and sale of the Charcoal Toothpastes was, and continues to, be substantially injurious to consumers, as well as unconscionable and in contravention of public policy.

---

[5]     And, for the rest, on top of their out-of-pocket economic injury, many are left with other murkier consequences such as depleted oral health or a continued inability to know for sure if the use of the Charcoal Toothpastes damaged their enamel or gums or was otherwise detrimental to their oral health.

16. Crest's false advertising and labeling and materially misleading claims and omissions have enabled it to sell the Charcoal Toothpastes in great quantity.

17. Defendant's conduct is unlawful and in breach of numerous warranties, and it violates numerous state consumer protection laws, as well as common law. Defendant was unjustly enriched as result of its misconduct.

18. Plaintiffs bring this proposed Class Action on behalf of themselves and other similarly situated consumers who purchased Crest Charcoal Toothpastes within the relevant statute(s) of limitations period. For the alleged violations of state statutory law and common law, Plaintiffs seek, on behalf of themselves and the members of the Class, to recover compensatory and statutory damages, treble or punitive damages as available, attorneys' fees and costs, as well as declaratory and injunctive relief.

## II.    JURISDICTION AND VENUE

19. This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and each of the named Plaintiffs is a citizen of a state different from the Defendant.

20. This Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the Defendant is a resident of the state of Ohio, and the named Plaintiffs are each residents of other states, and the amount in controversy exceed the sum or value of $75,000, exclusive of interests and costs.

21. Personal jurisdiction is derived from the fact that Defendant maintains its headquarters and principal place of business in the state of Ohio. Defendant systematically and

continuously conducts its business within the state of Ohio, including the labeling, advertising, marketing, dissemination, and sale of the Charcoal Toothpastes at issue.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because Defendant's principal place of business is located within this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, including labeling, advertising, marketing, dissemination, distribution and sale of the Charcoal Toothpastes at issue.

## III.   PARTIES

23.     Prior to their purchase of one or more of the Charcoal Toothpastes, each of the respective named Plaintiffs saw and reviewed Crest's claims on the Crest packaging and labeling of the product itself, and, unless otherwise indicated, the marketing claims made online. Plaintiffs read and relied on Crest's false and misleading labeling and marketing.

24.     Crest, as speaker, made multiple statements in its advertising and on its website to Plaintiffs and Class members, including but not limited to the functionality, attributes, and special value of activated charcoal as an ingredient, and that the products would whiten teeth, detoxify, lift stains, and that it would be gentle enough for routine use. These statements include but are not limited to, representations that the Charcoal Toothpastes are or can: (i) whitening; (ii) deeply clean; (iii) freshen breath; (iv) remove surface stains; (v) gentle; (vi) enamel safe; (vii) prevent cavities; (viii) purify teeth surface for a whiter, cleaner smile; ; (ix) strengthen enamel; (x) gently clean & remove stains; (xii) deep clean with charcoal for your teeth!; and (xiv) actively prevent staining.

25.     These statements made by Crest to Plaintiffs and Class members were made on Crest's website, on Crest's packaging, and on third-party retailers' websites that sell Crest

products. These statements were part of Crest's advertising from at least 2019-present day, the time period in which Plaintiffs and Class members purchased the Charcoal Toothpastes.

26. These statements are fraudulent for the reasons set out herein, including but not limited to the fact that instead of receiving and using a product that had unique properties, attributes and benefits due to the inclusion of activated charcoal as an ingredient, and that performed as promised, the products purchased by each respective Plaintiff were not as represented, as activated charcoal does not bear the purported benefits, attributes and properties that Crest claimed. The inclusion of activated charcoal does not add a special value, and in fact, was detrimental in the sense that it replaced other ingredients that were safe, effective and beneficial, and also in that its use in dentifrice can be unsafe and harmful to oral health and cosmetic appearance.

27. Plaintiffs would not have purchased a Charcoal Toothpaste but-for Crest's misrepresentations, and absent the material claims and omissions, they would not have suffered injury in fact and ascertainable losses. Plaintiffs altered their positions to their detriment and suffered damages as a consequence of purchasing one or more of the Charcoal Toothpastes.

28. Plaintiffs and the Class members were in direct privity with Defendant and/or its third-party retailers, or were intended third-party beneficiaries, given Plaintiffs' and the Class members' status as consumers of the Charcoal Toothpastes, and the ability of Defendant to identify most purchasers of the Charcoal Toothpastes.

29. The Charcoal Toothpastes were purchased by Plaintiffs and Class members via a third-party retailer whereby Plaintiffs and Class members were the intended third-party beneficiaries of the contracts between Defendant and its third-party retailers. Indeed, Crest's

website has a link next to all its Charcoal Toothpastes entitled "buy now," which will take consumers to various third-party retailers' websites to purchase the Charcoal Toothpastes.

30.     The inclusion of the "buy now" link underscores the existence of a valid and binding contract between Crest and third-party retailers, and that this contract was intended for Plaintiffs' and Class members' benefit, and that the benefit to Plaintiffs and Class Members is immediate: if Plaintiffs and Class members click on the link on Crest's website, it will take them to third-party retailers' sites to purchase the exact Charcoal Toothpaste as promised. The inclusion of the "buy now" link shows that Crest and its third-party retailers intend for consumers to rely on the link.

31.     Crest's messaging and marketing claims are substantial in volume and content and are ubiquitously made both online and in print on the product packaging and labeling of the Charcoal Toothpastes, such that the Plaintiffs and other consumers are exposed to a coherent advertising scheme and claims that are uniformly the same and/or substantially similar. Plaintiffs expected that the products would meet Crest's own representations (made on the product packaging itself and online), including but not limited to the functionality, attributes, and special value of activated charcoal as an ingredient, and that the products would whiten teeth, lift stains, detoxify, were enamel safe, and that they would be gentle enough for routine use.

32.     Each of the named Plaintiffs suffered economic loss and suffered damages because they purchased a falsely advertised and misbranded dentifrice(s) and did not receive the product they sought to purchase, failing to receive the benefit of the bargain. Their injury in fact includes ascertainable loss in the form of the total purchase price and out-of-pocket payment. They also paid a price premium over other products sold by Defendant that do not contain charcoal, as well as over competitors' products. Each of the Charcoal Toothpaste products

purchased by the respective Plaintiffs did not and could not deliver the promised health and cosmetic benefits and did not possess the detoxifying, 'whitening', stain lifting, and other properties Crest claimed. The products also lack the represented level of safety and safety substantiation. Moreover, upon information and belief (drawn from expert opinion as well as consumer complaints), use of the Charcoal Toothpastes poses some risk and is potentially detrimental to oral health and aesthetics.

33.     The Plaintiffs did not receive the promised benefits, efficacy or safety, nor did they receive the full value of their purchases. Each of the Plaintiffs expected that the product would meet Crest's own representations (made on the product packaging itself and online), and that it would be enamel safe and gentle enough for routine use and that it adequately provide dental hygiene and promote oral health. However, after a period of use, the Plaintiffs found that the products fell short of their reasonable expectations; and they later learned more about the extent of the Charcoal Toothpastes' failure to comport with Crest's representations, including the discovery that the inclusion of activated charcoal did not bring a special value, and was not worthy of the price premium paid and, even worse, that it rendered the entire product effectively worthless as well as dangerous.

34.     Plaintiff Erica Parks ("Plaintiff Parks" or "Ms. Parks") resides in Orlando, Florida. Plaintiff Parks purchased Crest 3D White Charcoal Whitening Therapy Deep Clean toothpaste in 2019 from a Publix in Orlando, Florida. She was influenced by the defendant's statements to her made via the advertising in 2019. Ms. Parks feels as if Defendant preyed upon her and Class members who feel they need to have whiter teeth to fit in. Ms. Parks previously saw other charcoal whitening products advertised by lesser known brands, but chose to use Crest because of its longstanding trusted reputation. When she saw that Crest was making a charcoal

toothpaste, she jumped at the chance to try it, but was soon sorely disappointed by the product's failures. Ms. Parks purchased the toothpaste for its alleged whitening properties. However, after a period of use her expectations were not met. After visually examining her teeth, she discovered her teeth were not becoming whiter and that the Crest product left a black residue on her teeth.

35.     Plaintiff Daniel T. Durgin ("Plaintiff Durgin" or "Mr. Durgin") resides in Boston, Massachusetts. Plaintiff Durgin purchased Crest 3D Whitening Therapy™ charcoal toothpaste (with fluoride) in or around July 2019 and also in or around September 2019. He bought the toothpaste based on claims made on the product packaging, representing that the product would whiten teeth and provide a "DEEP CLEAN," as also represented by the name of the product, which included the words, "WHITENING THERAPY."™ The marketing as a whole left Mr. Durgin with an impression that the product would be good for his teeth overall and would be safe to use. After a period of use of a several weeks after his first purchase and a shorter period after his second purchase, Mr. Durgin did not see his teeth become noticeably whiter. He also came across an article in the October 4, 2019 edition of Men's Health magazine,[6] which alerted him to the ineffectiveness and potential harm from charcoal toothpastes,[7] and he became concerned about his use of the product (that it was not only ineffective as a whitener, but that is also may not be safe to use and may cause damage to his teeth).

36.     Defendant The Procter & Gamble Company ("Procter & Gamble") is an Ohio limited liability company with its principal place of business at 1 P&G Plaza, Cincinnati, OH

---

[6]     Christa Sgobba, "Why Brushing Your Teeth With Charcoal Toothpaste Is Stupid and Unnecessary," *Men's Health*, Oct. 4, 2019 (subtitle: "The newest whitening fad might actually increase your risk of cavities").

[7]     The Men's Health article cited a 2017 statement from the British Oral Health Foundation (warning people that the whitening effects of activated charcoal may be overblown and that brushing with it may actually put your teeth at risk), the JADA review from 2017 and research from the *Journal of Physics: Conference Series* (which found that brushing with activated charcoal increases the roughness of tooth enamel, which "can put you at risk of greater plaque accumulation, more cavities, and even periodontal disease").

45202. Defendant is a multinational consumer goods corporation that owns a number of brands, including Crest.

37.    Crest is a wholly-owned subsidiary of Procter & Gamble. It is an oral care product company engaged nationwide in the business of selling toothpastes, mouthwash, and related products to consumers from its website, www.crest.com, and through the brick-and-mortar and online stores of third-party retailers. Crest conducts mass marketing campaigns and distributes its Charcoal Toothpastes throughout the United States.

38.    The Plaintiffs have standing to pursue injunctive relief. They continue to suffer ongoing harm because of their inability to be sure that the products they purchased were safe and did not cause damage or detriment or negative consequences of which they are not yet aware. They also have an imminent threat of future harm due to the inability to rely on the veracity of the labels and advertising of Charcoal Toothpastes in the future, when deciding whether to make a purchase of another Crest dentifrice. Each of the named Plaintiffs want to purchase toothpastes that  safely whiten teeth and bear other benefits, and would consider purchasing one or more of the Charcoal Toothpastes again if they could be sure that the representations and claims were truthful and accurate, and that the products are not mislabeled or falsely advertised. As a previously misled consumer, they will lack confidence in the representations made by Crest.[8]

39.    Moreover, the dentifrices that Plaintiffs intend to buy in the future, including those that are effective for safely and gently whitening teeth and provide other cosmetic and oral health benefits, even if not branded as "Crest" or in the same product in the line of Charcoal Toothpastes at issue here, may be under brands that are owned or acquired by Procter & Gamble.

---

[8]    Alternatively, when considering a purchase decision in the future, each will be injured if they believe that Crest's claims have in fact been substantiated or corrected, and, as any reasonable consumer would, think it is appropriate to rely on the labeling and marketing to be truthful and non-misleading and be confident in the representations concerning the products.

As such, on a broad level Plaintiffs' ability to trust in the accuracy of advertising and product labeling is, and will be compromised, absent specific injunctions ordering Defendant and its affiliates not to engage in false or misleading advertising and not to place products on the market without claim substantiation, or indeed, as long as unsafe and unsubstantiated products remain on the shelves.[9]

40.     The inability to rely on labels and advertising claims in the future is a harm to the Plaintiffs, and, because Crest continues to sell its Charcoal Toothpastes with the same advertising scheme and labeling, and its misconduct is ongoing, other consumers are currently being deceived and will continue to be deceived, just as the Plaintiffs and other consumers were previously deceived. The failure to correct these practices and provide injunctive relief goes against public policy, and state consumer protection laws.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Activated Charcoal

41.     Activated charcoal is made from coal, wood, coconut shells, sawdust, bamboo, or similar ingredients. The raw material is superheated, treated with different chemicals, and then superheated a second time with steam.[10]

42.     Activated charcoal has adsorptive qualities that have proven to be quite useful in certain limited contexts. For decades, it has been used in the emergency medical treatment of certain types of poisonings and drug overdoses, because, when administered correctly, it can adsorb certain heavy metals, drugs and other toxins.[11] The effectiveness of medicinal activated

---

[9]     *Id.*
[10]     "Activated Charcoal FAQ," General Carbon Corp. [http://generalcarbon.com/facts-about-activated-carbon/activated-carbon-faq/] (last accessed June 26, 2019) (General Carbon Corp. is an activated charcoal manufacturer).
[11]     *See generally*, Robert W. Derlet & Timothy E. Albertson, "Activated Charcoal—Past, Present and Future," 145 *West J. Med.* 493 (Oct. 1986) [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1306980/pdf/westjmed00158-0063.pdf].

charcoal in the emergency room setting is limited and dependent on specific factors, such as the type of drug, poison, or toxin, timing between ingestion of the toxin and ingestion of the medicinal charcoal, and dosage of each.[12]

43.　Activated charcoal has also been used in industrial and environmental settings to extract certain organic and inorganic substances from water.[13] For example, it is sometimes used to remove excess amounts of fluoride from drinking water.[14] It is used in juice manufacturing to control color and remove organic compounds.[15] Activated charcoal can also adsorb water-soluble vitamins, including forms of Vitamins C and B.[16]

44.　Inspired by the use of activated charcoal in these limited and particular contexts, enterprising companies like Defendant have been eager to extrapolate charcoal's adsorptive properties for use in a much broader context, often with little to no substantiation. Products containing activated charcoal are increasingly prevalent and are promoted with vague claims of 'detoxifying' properties as well as false or overstated health and beauty benefits. Activated charcoal has been marketed to the public as capable of extracting nearly any undesirable element or substance, and in nearly any context.

---

[12]　*Id.*; *see also* Derlet & Alberston, *supra* note 3, at 493–92 & Table 1; Jennifer A. Lowry, "Use of Activated Charcoal in Pediatric Populations," World Health Organization: Subcommittee of Expert Committee on the Selection and Use of Essential Medicines, Jan. 2008, at 2, [https://www.who.int/selection_medicines/committees/subcommittee/2/charcoal_rev.pdf ] (reviewing literature on medical use of activated charcoal).

[13]　*See generally* "The History of Activated Carbon," Jurassic Activated Carbon, Feb. 9, 2014 [https://www.jurassiccarbon.com/blogs/news/12186281-the-history-of-activated-carbon].

[14]　Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 *Int'l Proceedings of Chem., Biological, and Envtl. Eng'g* 139 (2015) [http://www.ipcbee.com/vol82/027-IEEA2015-C3024.pdf]; *see also* Behrooz Eftekhar et al., "The Effectiveness of Home Water Purification Systems on the Amount of Fluoride in Drinking Water," *J. of Dentistry, Shiraz U. of Med. Sci.*, Sept. 2015, at 278, (noting that use of home water purification systems, including several using carbon-based filtration methods, reduced the amount of fluoride in water).

[15]　Cetin Kadakal et al., "Research Note: Effect of Activated Charcoal on Water-Soluble Vitamin Content of Apple Juice," 27 *J. of Food Quality* 171 (Apr. 2004) [https://doi.org/10.1111/j.1745-4557.2004.tb00647.x].

[16]　*Id.*

15

45.     Yet, writes Scott Gavura in *Activated Charcoal, The Wellness Scam* (Science Based Medicine, Aug. 8, 2019): "what's popularly called a 'detox' today has nothing to do with actual medical detoxification," and "[f]ake detox, the kind you find in magazines, and sold in pharmacies, juice bars, and health food stores, is **make-believe medicine. The use of the term 'toxin' in this context is meaningless…. but it sounds just scientific enough to be plausible**." [17] Mr. Gavura goes on, "if you hear the words 'detox' uttered anywhere but an emergency room, keep in mind that you're hearing a **marketing pitch, not credible health evidence**." [18] "Despite the marketing hype, activated charcoal has no ability to suck out the toxic chemicals from the rest of your body." [19]

46.     Multiple scientific and consumer publications have made note of this logical fallacy and have debunked the broadly asserted 'detoxifying' properties of activated charcoal (particularly in its most commonly available form as an ingestible supplement). In April 2017, Consumer Reports published *Activated Charcoal Isn't a Magic Health Bullet,* wherein Julia Calderone writes: "In recent years, people have tried to translate the very limited success of activated charcoal in the ER to their everyday lives, assuming that if it can adhere to and remove certain drugs in an emergency room, it can stop all kinds of toxins, making an already healthy person even healthier." [20] Lisa Sasson, M.S., R.D., clinical associate professor of nutrition at New York University is quoted as saying "**this logical leap is not based in science**." [21]

47.     In another example from 2017, the Superfoodly.com website published *Activated Charcoal Uses May Be Harmful, Possibly Cancerous?* stating: "The problem is that none of

---

[17]     Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019 [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ].
[18]     *Id*. (emphasis added).
[19]     *Id*. (emphasis added).
[20]     Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/].
[21]     *Id*.

16

these cleansing/detox benefits are backed by science…. **using [charcoal] to remove toxins from your body is nonsensical**, unless you literally just ingested poison (and even then, only certain types will it absorb). There are no clinical trials or peer reviewed research which suggests activated charcoal removes toxins daily when used as a supplement."[22]

48.     Simultaneous with the charcoal trend, consumer demand for teeth-whitening products has risen. The global market for teeth-whitening products is expected to reach $7.4 billion by 2024.[23] Dentists, dental scientists, and researchers have raised concerns about the rapid growth of dental health 'fads,' including the use of charcoal dentifrice, which, even when "there is a lack of . . . scientifically supported information around such items, [] this does not stop them from being used."[24] As Dr. Ada Cooper, a spokesperson for the American Dental Association, recently stated: "**Just because something is popular doesn't mean it's safe**."[25]

### B.     Contemporary Scientific Studies Challenge the Safety and Efficacy of Activated Charcoal for Use in Dentifrice

49.     The first use of charcoal for oral hygiene dates back to Hippocrates in ancient Greece.[26] The Romans apparently followed this practice, along with other questionable oral care practices such as rinsing their mouths with urine.[27]

50.     In the United States, there have been several attempts to introduce charcoal as an oral health product. According to commentary published in the Journal of the American Dental

---

22      "Activated Charcoal Uses May Be Harmful, Possibly Cancerous?," Superfoodly (July 28, 2017) [https://www.superfoodly.com/activated-charcoal-uses-side-effects/].

23      https://www.hexaresearch.com/research-report/teeth-whitening-products-market.

24      Marco Antonio Dias da Silva & Anthony Damien Walmsey, "Fake News and Dental Education," 226 *British Dental Journal* 397, 397-99 (2019).

25      "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/]. (emphasis added).

26      *See* S.W.B. Newsom, "Hygiene and the Ancient Romans," *J. of Infection Prevention*, at 25, June 2004 [https://journals.sagepub.com/doi/abs/10.1177/14690446040050030601].

27      C. Valerius Catullus, "On Egnatius of the White Teeth," circa B.C. 84–54, (Tr. Richard Francis Burton, 1894), [http://www.perseus.tufts.edu/hopper/text?doc=Perseus:text:1999.02.0005:poem%3D39] (poem by the Roman poet Catullus referring to the practice of whitening teeth by rinsing with urine).

Association ("JADA") in 1932, a product named "Kramer's Original Charcoal Dental Cream," had been pronounced "not acceptable" as an Accepted Dental Remedy (ADR) by the Council on Dental Therapeutics (the "Council"). The Council found that "[c]linical experiences are recorded in which the particles of charcoal became imbedded in the gum tissue and produced a bluish line near the margin, which is removable only by surgical means."[28] When the Kramer's brand produced no evidence to rebut the clinical results, the Council denied it as an ADR "because it is a dentifrice intended for daily use that contains **charcoal, a potentially harmful substance**."[29]

51.     Decades after American dentistry rejected charcoal for use in dentifrice, the topic has again resurfaced, in light of the burgeoning consumer trend. One study, presented at the Academy of General Dentistry 2015 Annual Meeting, concluded that "activated charcoal was more abrasive than a whitening toothpaste on acrylic resins" and warned that "[t]he fine black charcoal powder may become embedded in defects such as margins or cracks present on older dentition."[30]

52.     In 2017, the Journal of the American Dental Association published a literature review to "examine the efficacy and safety of charcoal and charcoal-based dentifrices." John K. Brooks et al., *Charcoal and Charcoal-Based Dentifrices*, 148 JADA 661 (2017) (referred to herein as "*Charcoal-Based Dentifrices* (JADA 2017)" or "the 2017 JADA article"). The authors, Dr. John Brooks, DDS, Dr. Nasir Bashirelahi, PhD, and Dr. Mark A. Reynolds, DDS, PhD, reviewed the first 50 consecutive charcoal dentifrices from Google.com and Amazon.com to

---

[28]     John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 JADA 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).

[29]     *Id.* (emphasis added).

[30]     Brantley McCarty et al., "Activated Charcoal as a Whitening Dentifrice," Presented at Academy of General Dentistry 2015 Annual Meeting, June 18–21, 2015, San Francisco, CA [https://www.epostersonline.com/agd2015/node/72] (last accessed June 5, 2019).

assess how the marketing claims of these products compared with efficacy and safety of charcoal-based dentifrices as found in the available scientific literature.[31]

53.     The authors of *Charcoal-Based Dentifrices* (JADA 2017) reviewed advertising claims about the charcoal-based dentifrices on the market, and found: "Nearly one-half of the charcoal-based dentifrices were advertised as being capable of detoxification, with most claiming to detoxify the oral cavity or teeth. **Our review failed to identify scientific support in the literature that topical application of charcoal can provide any detoxification benefits to the teeth or oral mucosa.**"[32]

54.     The authors of the 2017 JADA article additionally reported that "**[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth preparations raises concern about damage to these oral structures, as well as increasing caries susceptibility due to the potential loss of enamel**."[33]

55.     The 2017 JADA article further noted that in the charcoal-based toothpastes containing fluoride, the **fluoride might "be rendered either chemically inert or minimally effective, as charcoal is a well-known absorptive agent capable of inactivating fluoride**."[34]

56.     In conclusion, the authors of *Charcoal-Based Dentifrices* (JADA 2017) stated:

> In our literature review, **we found insufficient scientific evidence to substantiate the cosmetic, health benefits** (antibacterial, antifungal, or antiviral; **reduced caries; tooth whitening; oral detoxification**), **or safety claims** of marketed charcoal-based dentifrices. **Controlled clinical trials and laboratory investigations of charcoal-based dentifrices . . . are needed to determine product efficacy and safety**.[35]

---

[31]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[32]     *Id.* (emphasis added). The authors were unable to identify any randomized, controlled clinical trials with a follow-up duration of 3 months or longer testing the safety or effectiveness of charcoal-based dentifrices. All of the available studies lacked adequate controls to measure clinical oral improvements with charcoal-based dentifrices.
[33]     *Id.* (emphasis added).
[34]     *Id.* (emphasis added).
[35]     *Id.* (emphasis added).

57.     In May 2019, the British Dental Journal confirmed that supporting scientific evidence remained lacking, and again raised the same and similar concerns reflected in the 2017 JADA article. Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 BDJ 697, 698 (2019) (referred to herein as "*Charcoal-Containing Dentifrices* (BDJ 2019)" or "the 2019 BDJ article"). It further noted the tendency for build-up of charcoal particles in surface defects, fissures, and gumline, and resulting poor aesthetic effects.[36]

58.     The May 2019 article in the BDJ, *Charcoal-Containing Dentifrices* (BDJ 2019), concluded that charcoal-based dentifrices "may be considered to be **a fashionable, marketing 'gimmick'**" that is "based on folklore on the use of different forms of charcoal for oral and dental remedies," or improperly based on "present day uses of charcoal for medical purposes."[37] The 2019 BDJ article lamented the prevalent and "**worrying approach**" in the marketing of charcoal dentifrices that places "a strong emphasis on benefits which appeal to consumers, which have yet to be disproved," and that favor a "'scientifically claimed until proved wrong' approach . . . over substantiated, evidence-based promotion."[38] The authors opined that "**the ethics of such an approach to the marketing of health-influencing products is at best questionable**. **False and deceptive messaging, together with the selective provision of information could be classed as misleading practice, contrary to the consumers' best interests and protection**."[39]

C.     **The American Dental Association has Not Approved any Activated Charcoal Dentifrice for its ADA Seal of Acceptance**

59.     The American Dental Association ("ADA") was founded in 1859.[40] Per the ADA's description of its mission, the ADA "exists to power the profession of dentistry and to

---

[36]     *Id.*
[37]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, 698 (2019).
[38]     *Id.* (emphasis added).
[39]     *Id.* (emphasis added).
[40]     https://www.ada.org/en/about-the-ada/ada-history-and-presidents-of-the-ada (last accessed November 18, 2019).

20

assist our members in advancing the overall oral health of their patients."[41] ADA presents itself as a "strong advocate[] for public health" working with an aim to keep patients "healthy from the dental chair to daily care at home."[42]

60.     In furtherance of the ADA's public health goals, the organization administers the ADA Seal of Acceptance Program ("Seal Program"), which began in 1931.[43] The ADA established its Seal Program to combat "extravagant claims" about what dental products could do.[44] Since that time, the ADA Seal of Acceptance has become "[u]niversally recognized by consumers as a symbol of safety and effectiveness" and "is carried on more than 300 oral health products, including toothpastes, toothbrushes, dental floss, mouth rinses, denture adherents, and chewing gum."[45] Companies can submit dental products to the Seal Program by including "data from clinical or laboratory studies that demonstrate safety and efficacy according to product category requirements developed by the ADA Council on Scientific Affairs."[46] Members of the ADA Council review submissions for adherence to product category requirements and, if necessary, utilize consultants with relevant specific area expertise.[47] Once a product's safety and efficacy has been demonstrated, the ADA Council will award the Seal of Acceptance.[48]

61.     A variety of major brands have sought and received the ADA Seal of Acceptance for certain products, including, but not limited to, Efferdent, ACT, CVS, Equate (Walmart),

---

[41]     https://www.ada.org/en/about-the-ada (last accessed November 18, 2019).
[42]     *Id.*
[43]     https://www.ada.org/en/science-research/ada-seal-of-acceptance (last accessed November 18, 2019).
[44]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What is the ADA Seal?" (last accessed November 18, 2019).
[45]     https://www.ada.org/en/about-the-ada (last accessed November 18, 2019).
[46]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What determines if a dental product qualifies for the Seal?" (last accessed November 18, 2019).
[47]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "How are products evaluated?" (last accessed November 18, 2019).
[48]     *Id.*

Listerine, Up and Up (Target), Oral-B, and Colgate.[49] **Significantly, the ADA has not granted the ADA Seal of Acceptance to any product with activated charcoal.**[50]

62.     Crest has not received the ADA Seal of Acceptance for the Charcoal Toothpastes.

63.     However, Crest *has* received the ADA Seal of Acceptance for other oral care products it has developed, marketed and sold to consumers, including the following products: Crest Pro-Health Gel Toothpaste – Clean Mint, Crest Pro-Health Toothpaste – Clean Cinnamon, Crest Pro-Health Night Toothpaste, and Crest Pro-Health Whitening.[51]

64.     Based upon the prevailing scientific literature regarding the lack of substantiation on safety and efficacy of activated charcoal in dental products, and the known risks and abrasiveness of charcoal, coupled with Crest's prior experience with the ADA Seal Program, Crest was or should have been aware of the unsuitability of the ADA Seal of Acceptance for its Charcoal Toothpastes. Nevertheless it has chosen to make the exact sort of false, deceptive, and/or misleading extravagant claims that inspired the creation of the ADA's Seal Program.

**D.     Crest's Representations on the Charcoal Toothpastes' Labeling, Packaging, Advertising, and Marketing**

65.     Since at least 2018, Defendant has packaged, marketed, distributed, and sold some or all of its Charcoal Toothpastes. Examples of the product packaging, marketing, and tubes include:



---

[49]     https://www.ada.org/en/sci           seal-shopping-list (last accessed November 18, 2019).
[50]     *See* https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed November 18, 2019).
[51]     *See* https://crest.com/en-us/oral-health/why-crest/faq/do-crest-toothpastes-have-the-american-dental-ada-seal.

22











66.     Featured predominantly in the printed labeling of the tubes and packaging for many currently available Charcoal Toothpastes are the claims for "gently cleansing", "cleansing" or "removes surface stains".

67.     On its website, on or around the time of Plaintiffs' respective purchases, Crest claimed that it had added two new "whitening toothpastes that contain charcoal and coconut oil to help you further realize your individual radiance." It went on to claim that the Charcoal Toothpastes "**continue to support the health of your teeth and gums through a deep and gentle clean.**"



**E.      The Claimed Benefits, Attributes, Safety and Functionality of the Charcoal Toothpastes are Debunked or Unsubstantiated by Scientific Evidence, and are Misleading, Deceptive, Impossible, and/or Untrue**

**(i)      *Detoxifying***

68.      Crest's marketing of the Charcoal Toothpastes highlights the purported detoxifying properties of activated charcoal. For example, Crest's website claims that its Gum Detoxify Charcoal Toothpaste "has a unique and ativated [sic] foam formula with charcoal that penetrates hard to reach places to neutralize harmful plaque bacteria even around the gumline."[52]

69.      In reality, Crest's claims are specious and make misuse of the term "detoxification." As previously discussed, detoxification is a *medical term* that refers to emergency treatments for dangerous levels of drugs, alcohol, or poisons, like heavy metals.[53]

---

[52]      https://crest.com/en-us/products/toothpaste/crest-gum-detoxify-charcoal-toothpaste.
[53]      Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019 [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ].

Moreover, there are no clinical trials or peer reviewed research which suggests activated charcoal removes toxins daily when used as a supplement."[54]

70.     Even more implausible than the 'detoxifying' effects of ingestible charcoal supplements, are purported 'detoxifying' properties in topically applied personal care products containing charcoal, such as dentifrice. The logic of employing charcoal in this context is even more attenuated and is, in fact, *wholly unsupported*. As one wellness writer has put it:

> "**At the root of the activated charcoal health fad is the misuse, or misunderstanding, of the word 'toxin.'** In a detox-crazy world, toxins are used to refer to impurities or anything undesirable in your body: **stains on your teeth**, dirt or dust on your skin, naturally present sugars in your juice, a hangover after a night out. **Personal care products (like teeth whiteners**, face masks, soaps, shampoos, and deodorants) containing activated charcoal **bank on the idea that impurities can be draw out during use**. . . But **there is little to no research to prove that the trace amounts of activated charcoal, combined with other ingredients, in these products are effective and much more than just marketing**."[55]

71.     Crest's detoxification claims are a marketing gimmick with no basis in fact.[56] The same or very similar consumer-appealing claims have been assessed by dental experts and determined to be unsupportable (see, e.g., the 2017 JADA and 2019 BDJ articles).  Put simply, **there is no scientific support** "**that topical application of charcoal can provide any detoxification benefits to the teeth or oral mucosa**."[57] This includes "antibacterial, antifungal,

---

[54]     "Activated Charcoal Uses May Be Harmful, Possibly Cancerous?," Superfoodly (July 28, 2017) [https://www.superfoodly.com/activated-charcoal-uses-side-effects/];  Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019  [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ]; Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/].

[55]     Katie Mui, "Activated Charcoal: The Powerful Detox Ingredient You Don't Want in Your Regular Diet," GoodRx, Feb. 7, 2019  [https://www.goodrx.com/blog/what-is-activated-charcoal-detox-medication-interactions/]. (emphasis added).

[56]     To the extent charcoal-based dentifrices do appear to effectuate certain purported oral hygiene or aesthetic benefits, it is not its porousness, but rather the *high abrasiveness* of the charcoal particle that enables any seemingly positive results, and in a short-sighted and risky manner.

[57]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

27

or antiviral" benefits, as well as reduced caries or a more general (and ill-defined) notion of "oral detoxification."[58]

**(ii)** *Whitening*

72.    Crest's whitening and surface-stain removal claims for the Charcoal Toothpastes (made on its product packaging, labeling, marketing and advertising) include but are not limited to: "whitening" and "removes up to 80% surface stains".

73.    When a toothpaste or toothpowder is advertised as "whitening," most reasonable consumers believe it will leave their teeth whiter. However, dentists and researchers have warned that charcoal dentifrice companies' "whitening" claims are misleading, due to the failure to clarify the distinction between intrinsic and extrinsic whitening mechanisms. As opposed to intrinsic whiteners, the British Dental Journal explains, many "products whiten teeth, to different extents, by the removal of surface (extrinsic) stains, which may reform relatively quickly in, for example, a smoker. Typically, these products do not change the intrinsic colour of the tooth, which is largely determined by the colour of the dentine."[59]

74.    Linda Greenwell, in her 2017 article *Charcoal Toothpastes: What We Know So Far*, concluded: "[t]here is no evidence that the use of charcoal toothpaste has an effect on intrinsic (internal) staining of teeth or on intrinsic whitening of the teeth."[60] In 2019 Ms. Greenwell, as co-author *Charcoal-Containing Dentifrices* (BDJ 2019), re-affirmed the conclusion that activated charcoal "does not change the colour of the teeth other than by abrasive action similar to that of a 'smoker's toothpaste'. . . ."[61] "The common interchangeable use and

---

[58]    *Id.*

[59]    Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental J.* 697, 699 (2019).

[60]    Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017) [https://www.pharmaceutical-journal.com/opinion/correspondence/charcoal-toothpastes-what-we-know-so-far/20203167.article?firstPass=false].

[61]    Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental J.* 697, 699 (2019).

misuse of the terms 'whitening' and 'bleaching' is therefore misleading and confusing to consumers and patients, with the marketing of some charcoal and other dentifrices being no exception."[62]

75.     The Charcoal Toothpastes do not intrinsically whiten teeth. As such, any claimed "whitening" properties of the Charcoal Toothpastes are limited to the removal of extrinsic surface stains, and therefore misleading.[63]

76.     Crest's whitening claims are deceptive for the additional reason that it presents the Charcoal Toothpastes as possessive of "whitening" qualities due to the unique and inherent attributes of activated charcoal – essentially that whitening is effectuated by adsorbing and lifting stains.

77.     This is misleading and deceptive. Charcoal functions as an abrasive agent. Its composition and fractal-shaped particles make it highly abrasive to tooth enamel.[64] As such, any extrinsic stain-lifting that could be viewed as 'whitening' is achieved simply by mechanical abrading of extrinsic stains, and is *not achieved from adsorptive qualities of the charcoal*; rather it is achieved by the *particularly abrasive effects of the charcoal*.

78.     Put another way, the Charcoal Toothpastes "work" to "whiten" teeth through abrading away the stains and deposits having the charcoal particles scrape off the surface of the teeth, i.e. the tooth enamel. The adsorptive qualities of charcoal are irrelevant in the context of purported teeth whitening, and Crest's representations in this regard are misleading and deceptive, similarly to its frivolous 'detoxifying' claims.

---

[62]     *Id.*
[63]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[64]     *See, e.g.,* Matthias Epple et al., "A Critical Review of Modern Concepts for Teeth Whitening," 79 *Dentistry J.*, 7 (Aug. 1, 2019) [https://www.mdpi.com/2304-6767/7/3/79/htm].

79.     Abrasive ingredients are commonly used in dentifrice and function to mechanically lift extrinsic stains, reduce the adhesion of dental biofilms and chromophores from the enamel surface, and otherwise improve discoloration and clean the teeth. However, there are numerous commonly accepted and widely used abrasives that are effective and more gentle than charcoal, and have undergone clinical testing as well as ADA scrutiny. There are no long-term clinical studies of the effects of its use, and charcoal (which is particularly abrasive due to its unique particle shape and composition) is not in the ADA-approved list of abrasives.

80.     Lastly, and arguably at worst, consumer experience and dental expert opinions alike indicate that long-term use of the Charcoal Toothpastes could potentially result in a darkened and yellow tooth appearance. This is because, when teeth are regularly brushed with highly abrasive substances such as charcoal, the enamel can wear down and cause the tooth's dull, internal dentin to show through. As Dr. Ada Cooper, spokesperson for the American Dental Association, has explained: "Using materials that are too abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[65] Furthermore, the removal of enamel by abrasive whitening dentifrices not only exposes the yellowish dentin, but also causes teeth to stain even more easily in the future – with the sensitive dentin exposed and no longer protected by enamel.

**(iii)**     ***Effective and adequate for dental hygiene maintenance***

81.     Printed on the Charcoal Toothpastes' tubes and packaging and on Crest's websites are its claim that its Charcoal Toothpastes are "gentle" and "gently cleanse." Crest describes its Charcoal Toothpastes as "whitening" and that they "strengthen enamel."

---

[65]     "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

82.     The packaging instructions and marketing statements send the message that consumer use of the Charcoal Toothpastes should approximate a regular brushing routine and that the products are appropriate for a consumer to use as their primary everyday source of oral hygiene.

### *Abrasive damage to enamel and gums*

83.     While proclaiming that the Charcoal Toothpastes are gentle, Crest also fails to disclose material facts, such that activated charcoal has *not* been substantiated as safe and effective for use in dentifrice, and both JADA and the BDJ have confirmed insufficient scientific evidence to substantiate safety claims (as well as cosmetic and health benefits) as well as raised concerns about risks associated with the use of charcoal dentifrices.

84.     Activated charcoal is known to be a highly abrasive and harmful substance to tooth enamel.[66] Multiple scientific studies have noted its abrasiveness presents a risk to enamel and gingiva in the context of oral care products. As noted in the 2017 JADA article: "[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth preparations raises concern about damages to these oral structures, as well as increasing caries susceptibility due to the potential loss of enamel."[67] The 2019 BDJ article again noted the risk to enamel and gingiva posed by charcoal's abrasivity.[68] So instead of "strengthen[ing] enamel," as claimed by Crest, the charcoal in the Charcoal Toothpastes is actually more likely to cause the opposite result.

### *Oral health effects from abrasive damage*

---

[66]     *See, e.g.,* John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 785 (2017) [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)) (Concluding a charcoal dental cream was not an acceptable dental remedy "because it is a dentifrice intended for daily use that contains charcoal, a potentially harmful substance").

[67]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

[68]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).

85.     Moreover, the abrasive damage to tooth enamel caused by charcoal can set the stage for spiraling into additional oral health issues. It has been shown that increased surface roughness of teeth creates an environment conducive to increased bacteria in the oral cavity. This, in turn, can lead to other problems and is correlated with high caries and periodontal disease.

86.     On a general level, the optimal formulated toothpaste maximizes cleaning while minimizing abrasiveness. The abrasives employed in a toothpaste should effectively polish teeth and remove biofilms and stains, but not abrade on the tooth structure itself. The findings of a controlled scientific study, published in a 2017 article, *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, confirmed that charcoal-based toothpastes are more abrasive and affecting on the surface roughness of a tooth as compared to other non-charcoal whitening toothpastes.[69] Charcoal's abrasiveness is related to its composition and its irregular "star shaped" particles.[70] The "research concluded that there were increasing surface roughness values of tooth surfaces after the use of toothpaste containing charcoal, and the increased surface roughness was statistically significant . . . ."[71] Increased surface roughness on a tooth's enamel is "a strategic place for bacteria to adhere to the tooth's surface," and "[t]he presence of bacteria in the oral cavity is one of the causes of high caries and periodontal disease risk."[72]

87.     Still more problematic, experts have noted that certain characteristics of Charcoal Toothpastes tend to prolong users' brushing time and increase brushing vigorousness, which can serve to *further exacerbate the abrasive effect* of charcoal dentifrices. The first such characteristic is the distinct black color of pastes containing charcoal. "Charcoal-containing

---

[69]     U I Pertiwi et al., *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, IOP Conf. Series: Journal of Physics: IOP Conf. Series 884 (2017) [iopscience.iop.org] (doi:10.1088/1742-6596/884/1/012002).
[70]     *Id.*
[71]     *Id.*
[72]     *Id.*

toothpastes are black in colour and brushing off the colour tends to prolong brushing, or the use of excessive brushing force, which may lead to the abrasion of teeth."[73] The same phenomena occurs with dentifrices claimed to have 'whitening' properties, as consumers might brush more frequently and vigorously to achieve the desired whitening more quickly, not realizing that "excessive brushing with a charcoal-based dentifrice may cause more harm than good."[74]

### *Negative aesthetic results*

88.     Studies also show bad aesthetic effects in some users. "Particles of charcoal included in charcoal toothpaste may accumulate in crevices and other defects in teeth, including cracks in the teeth of older individuals."[75] For "patients with established periodontal disease," the use of charcoal-based dentifrices may result in "the accumulation of charcoal particles deep in periodontal defects and pockets, causing grey/black discoloration of the periodontal tissues."[76]

89.     Studies have shown that the staining and discoloration caused by charcoal dentifrices can impact dental implants. When grey lines are created by the buildup of charcoal particles between dental restorations and teeth, it can ultimately "necessitate the costly replacement of the affected filings, veneers or crowns."[77]

### *Potential for compromised efficacy of the Fluoride Charcoal Toothpastes*

90.     As a dentifrice ingredient, fluoride is an effective agent known to protect against cavities and tooth decay; help mineralize teeth to avoid tooth breakdown; and help prevent bacterial overgrowth in the mouth. Under the applicable federal regulatory framework (discussed

---

[73]     Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).
[74]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019). (emphasis added).
[75]     Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).
[76]     Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).
[77]     Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).

more fully *infra*), toothpastes containing fluoride are regulated as drugs (as opposed to cosmetics), since fluoride is an anti-cavity agent and can affect the structure of the tooth. Because they contain fluoride, and also by merit of the claims made on its packaging, the Charcoal Toothpastes are classified as anticaries drugs and regulated as such by the FDA, in particular by the FDA's Anticaries Monograph.

91.     Plaintiffs note that federal preemption of their fluoride-related claims is inappropriate because the Anticaries Monograph does not address whitening claims related to toothpastes, nor does it address any claims relating to charcoal as an ingredient. Further, Plaintiffs are not asserting any claims challenging the safety or efficacy of fluoride. Any state law requirements sought to be imposed by Plaintiffs are entirely consistent with, if not identical, to requirements imposed by federal law.

92.     It is well known that charcoal can strongly affect fluoride, and is sometimes used to extract fluoride from community water supplies.[78] The 2017 JADA article noted that fluoride might "be rendered either chemically inert or minimally effective" in a toothpaste containing charcoal.[79] The 2019 BDJ article noted that "any fluoride and other active ions in charcoal-based toothpaste may not be available in use to affect enhanced cleaning or chemical changes to the tooth substrate."[80] "As such, charcoal-based toothpastes, despite containing fluoride may have limited capacity to remineralise enamel, let alone increase its resistance to caries and tooth wear processes."[81]

93.     On the labeling, Crest claims its Charcoal Toothpastes contain "cavity protection" and are "enamel safe," and on the packaging and on its website states it "strengthens enamel".

---

[78]     See, e.g., Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 *Int'l Proceedings of Chem., Biological, and Envtl. Eng'g* 139 (2015)
[79]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[80]     Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).
[81]     Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).

However, the fluoride in the Charcoal Toothpastes may be impacted or inactivated by the charcoal. Class members who purchased Charcoal Toothpastes were potentially deprived of the dental benefits they thought they would receive by purchasing one of the Charcoal Toothpastes, including preventing cavities and/or strengthening enamel, because the fluoride it contains has been potentially been effectively rendered inert.[82]

*The replacement of widely accepted ingredients with charcoal (whose safety and efficacy has not been established) jeopardizes consumers' oral hygiene and oral health*

94.    Researchers have warned that marketers' overhype of purported health and safety benefits of charcoal dentifrices can cause consumers to believe they are making safe and responsible choices but unwittingly risk their long-term oral health. Extreme marketing tactics, broad and exaggerated marketing claims and deceptive and false promises, in the absence of disclosures of the truth about inadequate substantiation, cause consumers to purchase and use a charcoal dentifrice, often in lieu of a non-charcoal dentifrice that *has* in fact been established as safe and effective. As the 2019 BDJ article authors noted:

> "The unsubstantiated claims that certain charcoal-based dentifrices, any of which are described as eco-friendly, ecological, herbal, natural, organic or pure, have antibacterial, antiseptic and/or anti-fungal qualities, **may lull consumers into thinking that the use of such dentifrices may be a sustainable way to prevent or possibly even treat periodontal disease**, over and above whatever claims they are inclined to believe. Such persuasion of consumers, many of whom may have established oral and dental disease, is considered to be **opportunistic marketing, with little regard to the consequences of the exploitation**."[83]

95.    For example, the over-marketing of charcoal dentifrices can cause customers to abandon fluoride toothpastes for fluoride-free varieties, believing in purported oral health properties that do not exist. The authors of the 2019 BDJ article noted the "concerning [. . .]

---

[82]    Plaintiffs do not allege that the fluoride was, in fact rendered inert, nor do they assert it as the specific basis for the claims or damages alleged herein; however, these findings concerning the adverse effect of charcoal on fluoride are discussed and raised herein in the context of the larger marketing scheme, not as essential basis for recovery by consumers of the Charcoal Toothpastes.

[83]    *Id.*

potential for individuals changing from the use of a regular fluoride-containing toothpaste to the use of a charcoal toothpaste which contains no fluoride, thereby increasing their risk of caries."[84] The authors of the 2017 JADA article also raised this concern, and advised that dentists should "educate their patients about the **unproven claims of oral benefits and possible health risks associated with the use of charcoal dentifrices and the potential increased risk of developing caries with the use of these nonfluoridated . . . products**."[85]

96.     This same phenomena (of abandoning other tried and true toothpastes for the untested Charcoal Toothpastes) extends beyond just fluoride. Crest promises multiple oral hygiene benefits from use of the Charcoal Toothpastes, including that it is "enamel safe," "gently cleanses," "purifies teeth surface" and "freshens breath."

97.     Charcoal and its adsorptive properties do not play a role in freshening breath. The 2019 BJD article states:

> Given the adsorption capabilities of activated charcoal, which make it an antidote to acute poisoning and drug overdose, it could be assumed that it would be good constituent of a dentifrice for adsorbing the substances responsible for halitosis. Brushing with a charcoal-based dentifrice may leave the mouth feeling fresh, but such mouth freshness, possibly tempered by an earthy aftertaste of charcoal, may be short-lived, as charcoal does not counter the causes of halitosis. Furthermore, the adsorptive nature of charcoal in the dentifrices may limit the effects of flavourings, essential oils and any other constituents included in the formulation to mask mouth odour, thus limiting the effects of the dentifrices on halitosis.[86]

98.     Crest's inclusion of the untested ingredient of charcoal is particularly ill-advised in light of the fact that the assumed premise of charcoal's purported mode of action is not only untested and unsubstantiated, it is considered by many experts to be simply nonsensical: *i.e.*, that the activated charcoal *binds* to surface stain deposits, tannins, plaque, bacteria, odors, and any

---

[84]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).
[85]     *Id*. (emphasis added).
[86]     *Id*.

other noxious or undesirable element, then *adsorbs* such elements into the porous charcoal particle and is brushed away, leaving clean and polished teeth, a detoxified mouth, and fresh breath.

> **F.    Crest Knew or Should Have Known its Representations and Omissions on Whitening Effects, Detoxifying/Adsorptive Properties, Oral Hygiene Benefits and Safety were Misleading, Deceptive and/or False**

99.    Crest's Charcoal Toothpastes are subject to a federal legal and regulatory framework concerning the marketing, advertising, branding, and labeling of drugs and cosmetics. (Toothpastes and other dentifrice are classified as cosmetics, drugs, or a combination thereof.) As a purveyor of regulated oral care products, making various claims as to safety, oral health, cosmetic effects, and even some medicinal and disease-prevention claims, Crest knew or should have known of its duties under such regulations. Indeed, as previously discussed, Crest has undergone the rigorous process to obtain an ADA Seal on some of its products (but has not done so for any of its charcoal products). Many of Defendant's misleading and deceptive practices as to the Charcoal Toothpastes were prohibited by federal and state regulations, of which Crest was certainly aware.

100.    The Federal Trade Commission Act (15 U.S.C. § 41 *et seq*.) ("FTC Act"), as well as the Federal Food, Drug and Cosmetic Act (21 U.S.C. §321 *et seq*.) ("FD&C Act"), the Fair Packaging and Labeling Act (15 U.S.C. §1451 *et seq*.) ("FP&L Act") and the regulatory frameworks and rules created thereunder impose obligations on marketers and distributors such as Crest. These federal laws were created with the aim to protect consumers from unfair and deceptive practices (including unsafe or deceptively labeled or packaged products), as well as to protect against unfair competition. Similarly, multiple state laws have statutes that incorporate and/or mirror pertinent portions of the federal regulatory framework.

101.    In this pleading, Plaintiffs acknowledge Crest's obligations and duties under this federal framework under federal and parallel state frameworks for purposes related to the elements of the common law and state statutory causes of action asserted herein (such as the existence of various legal duties and obligatory standards of care, the existence of a special relationship and duties arising therefrom, as well as to underscore that Crest knew or should have known of its noncompliance and that its conduct was wrongful). Plaintiffs expressly disclaim any attempt to hold Crest to a higher standard than that which is required under federal law, and do not seek relief or remedy for conduct to a standard exceeding that which is required under federal law.[87]

102.    Likewise, the allegations herein as to the Charcoal Toothpastes do not purport to improperly assert a private right action for any purported violation of the FDA's Anticaries Monograph or other otherwise seek to compel compliance with federal rules or regulations whose enforcement is in the province of a federal agency.[88]

103.    The Charcoal Toothpastes are both a "cosmetic" and a "drug," qualifying as a drug/cosmetic combination.[89]

---

[87]    The allegations concerning conduct that violates the FD&C Act, the FTC Act, regulations thereunder, and/or other parallel state laws and regulations, as raised herein, are properly asserted in the context of the causes of action and relief sought herein, and are not barred by preemption. *See, e.g., Reid v. GMC Skin Care USA Inc.,* No. 15-CV-277, 2016 WL 403497, *10 (N.D.N.Y. Jan. 15, 2016) ("Plaintiffs' claims, if proven to be true, would simply require Defendant to truthfully state the efficacy of its products or not sell its products; such relief would not impose a state requirement that is different from or in addition to, or that is otherwise not identical with that of the FDCA.").

[88]    "There is nothing in the [Anticaries Monograph] regarding whitening toothpastes or products." *Canale v. Colgate-Palmolive Co.,* 258 F.Supp.3d 312, 321 (S.D.N.Y. 2017). "The final Anticaries Monograph approves only certain claims regarding decay prevention in dental hygiene products with certain active ingredients for certain intended uses. That a toothpaste contains sodium fluoride, an active ingredient approved under the monograph, and therefore may advertise its cavity-preventing qualities, does not, for example, permit its manufacturer to make misleading claims about the toothpaste's ability to clear acne. If [. . .] *Bowling* were taken literally and out of context, a manufacturer could make such a claim, and then point to the Anticaries Monograph to immunize it against state law claims challenging that assertion. Congress cannot have intended such sweeping preemption." *Canale v. Colgate-Palmolive Co.,* 258 F.Supp.3d 312, 323 (S.D.N.Y. 2017), citing *Bowling v. Johnson & Johnson*, 65 F.Supp.3d 371, 375-76 (S.D.N.Y. 2014); *In re PepsiCo, Inc.,* 588 F.Supp.2d 527, 538-39, n. 10 (S.D.N.Y. 2008).

[89]    Section 509 of the FD&C Act provides that the categories of "drug" and "cosmetic" are not mutually exclusive.

**The FTC Act and FTC regulations**

104.    Section 5 of the FTC Act broadly prohibits unfair and deceptive trade practices (15 U.S.C. § 45), and Section 12 of the FTC Act prohibits the dissemination of false and misleading advertisement of food, drugs, and cosmetics (15 U.S.C. §§ 52).[90]

105.    The FTC requires advertisers to possess a reasonable basis for their advertising and marketing claims.[91]  Claims concerning health and safety must be supported by competent and reliable scientific evidence.

106.    The FTC requires that an advertiser substantiate its claims (express and implied) *before* it disseminates said claims, and, when an advertiser actually conveys to a consumer (expressly or impliedly) that it has certain level of support or evidence for its products, it must have such substantiation *to the actual level* it claims to possess.

**The FD&C Act and FDA regulations**

107.    The FD&C Act prohibits the marketing and movement in interstate commerce of adulterated or misbranded food, drugs and cosmetics. 21 U.S.C. § 321 *et seq*. FD&C Act defines "drug" and "cosmetic" at 21 USC §321(g)(1) and 21 USC §321(i), respectively.

108.    The FD&C Act (21 U.S.C. § 321 *et seq*.) prohibits the marketing and movement in interstate commerce of adulterated or misbranded food, drugs and cosmetics.[92]

109.    The FD&C Act provides that a drug or a cosmetic will be considered misbranded for numerous potential reasons, including if the drug or cosmetic's "[] labeling is false or

---

[90]    For purposes of Section 12 of the FTC Act, classification as a "drug" or "cosmetic" is based on the definitions at Section 15 (c) and (e) of the FTC Act, 15 U.S.C. § 55(c), (e).

[91]    The FTC requires companies to "have a reasonable basis for advertising claims before they are disseminated, and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act. . . ." *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *In the Matter of Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir. 1986).

[92]    The FD&C Act defines "drug" and "cosmetic" at 21 USC §321(g)(1) and 21 USC §321(i), respectively. The Charcoal Toothpastes at issue qualify as cosmetics, as they are fluoride-free and are intended to be applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance.

misleading in any particular." 21 U.S.C. § 352(a) (misbranded drugs[93]); 21 U.S.C. § 362(a) (misbranded cosmetics). Labeling will be deemed misleading not only because a label statement is deceptive in its representations, and also when a material fact is not revealed on a label. As to the latter, labeling is deemed misleading if it fails to reveal facts that are material in light of other representations, or material with respect to the consequences resulting from the intended use of the product. 21 CFR 1.21 (Failure to reveal material facts).

110.    A cosmetic is also considered misbranded if its safety has not been adequately substantiated, and it does not conspicuously bear the statement: "**Warning – The safety of this product has not been determined**." 21 CFR 740.10. The safety of a cosmetic may be considered adequately substantiated if experts qualified by scientific training and experience can reasonably conclude from the available toxicological and other test data, chemical composition, and other pertinent information that the product is not injurious to consumers under conditions of customary use and reasonably foreseeable conditions of misuse.[94]

111.    As a company engaged in the interstate marketing, distribution and sale of its Charcoal Toothpastes, Crest was or should have been aware of its legal duties under these laws, as well as the regulatory framework built thereunder. Crest's legal duties include but are not limited to: (i) to ensure the safety of the Charcoal Toothpastes; (ii) to disclose risks of use and safety hazards; (iii) to ensure the advertising claims and the label and packaging of the Charcoal Toothpastes are not misleading or deceptive in their claims and omissions; (iv) to possess adequate and credible substantiation for its claims; (v) to disclose the lack of substantiation,

---

[93]    The FDA labeling requirements for over-the-counter (OTC) anticaries drug products, for example, are specific and numerous, as well as generally prohibitive of misbranding that might mislead the consumer. See, e.g., 21 CFR 355.50 (Labeling of anticaries drug products) and 21 CFR 330.1 (General conditions for general recognition as safe, effective and not misbranded).

[94]    *See, e.g.,* FDA Cosmetic Labeling Guide, https://www.fda.gov/cosmetics/cosmetics-labeling-regulations/cosmetics-labeling-guide.

particularly for safety; (vi) to impart correct information to consumers; and (vii) to refrain from making affirmative representations that are false, untrue, impossible, incorrect, and/or misleading.

112. Defendant was, or should have been, aware of its obligations under the above-described legal and regulatory framework, yet appears to have disregarded its duties as to claim substantiation, safety, marketing and advertising, as well as to product packaging and labeling. This further underscores that it knew or should have known its acts and practices were also unlawful under state consumer protection laws.

113. Defendant knew or should have known that it did not possess the legally required substantiation for its claims.[95]

114. Defendant also knew, or should have known, that the Charcoal Toothpastes did not possess the promised benefits and safety, and that there was risk of harm. Scientific studies and journals that contradicted many of Crest's claims were published and available to Crest at the time it disseminated its claims and marketing content.

115. Moreover, Crest would not have even had to look to academic or scientific resources, because the scientific findings were also reported in consumer reports and mainstream media outlets during the time the Charcoal Toothpastes were developed, marketed and sold. Examples include:

> ABC News, June 2017, *How Safe is Activated Charcoal?* reports concerns of Dr. Upen Patel, D.D.S., because charcoal dentifrices are not evaluated by the ADA for long term use, can erode enamel, abrasiveness, gums, and tissue, and the small charcoal particles

---

[95] The FTC requires companies to "have a reasonable basis for advertising claims before they are disseminated, and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act. . . ." *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *In the Matter of Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir. 1986).

"can get stuck in your gums and in small cracks in your teeth, so you can have these little black lines in your gums and your teeth you can't get out."[96]

Prevention.com, September 2018, *Is Charcoal Toothpaste the Answer to Whiter Teeth?,* quoted Dr. Kenneth Magid, D.D.S., adjunct clinical associate professor at NYU College of Dentistry: "Not only do charcoal toothpastes not meet the criteria that I would use to recommend them, but they may be too abrasive and damaging to teeth." "Since charcoal toothpastes aren't regulated by any agency or approved by the ADA, many of the products may be too abrasive for regular use and can possibly remove the enamel outside of the teeth or damage porcelain restorations such as veneers or crowns." "Once the enamel wears away, there's no way to regrow it, and on top of that, it can actually make your teeth look duller and darker instead of brighter. This is due to the underlying dentin showing through. . . . In addition to darkening your smile, wearing down your enamel will also make your teeth more sensitive to temperature and prone to cavities."[97]

BBC, May 2019, *Charcoal Toothpastes 'don't whiten teeth,'* cited the British Dental Journal for the premise that "charcoal-based toothpastes, which claim to whiten teeth, are a 'marketing gimmick' which could increase the risk of tooth decay," and are "more abrasive than regular toothpastes, potentially posing a risk to the enamel and gums." The article quoted Dr. Greenwall-Cohen as stating that charcoal particles in toothpastes can "get caught up in the gums and irritate them," and also be problematic for fillings.[98]

Harper's Bazaar, August 2018, *Is Charcoal Toothpaste Safe to Use*? (re-published in July 2019), reported on the doubts and issues raised by the British Dental Journal, noting, "[u]nlike your liver and kidneys, the teeth and gums don't perform a detoxifying function of the body, and since so-called toxins aren't generally hanging out in your mouth anyway, there's not much point in using your tooth cleaning to purge them."[99]

DailyMail, May 2019, *Charcoal-based Toothpastes do NOT whiten teeth and may lead to tooth decay as dentists warn the products are reliant on 'marketing gimmicks and folklor*e, quotes Professor Damien Walmsley, scientific adviser for the British Dental Association: "Charcoal-based toothpastes offer no silver bullets for anyone seeking a perfect smile, and come with real risks attached." "These abrasive formulations may be effective at removing surface stains, but prolonged use may also wear away tooth enamel. Research now shows it could even cause discoloration of the gums."[100]

---

[96] Irene Cruz, "How Safe Is Activated Charcoal?," ABC 10 (June 9, 2017) [https://www.abc10.com/article/news/local/how-safe-is-activated-charcoal/447456019].

[97] Macaela Mackenzie, "Is Charcoal Toothpaste the Answer to Whiter Teeth?," Prevention (Sept. 26, 2018) [https://www.prevention.com/beauty/a23470865/charcoal-toothpaste/].

[98] "Charcoal Toothpastes 'don't whiten teeth,'" BBC: Health, May 10, 2019 [https://www.bbc.com/news/health-48216116].

[99] Lauren Hubbard & Alexandra Tunell, "Is Charcoal Toothpaste Safe to Use?," Harper's Bazaar, Aug. 14, 2018 (updated: Harper's Bazaar Staff, "Is Charcoal Toothpaste Safe to Use?," July 31, 2019) [https://www.harpersbazaar.com/beauty/health/advice/a3764/charcoal-toothpaste-pros-cons/].

[100] Victoria Allen, "Charcoal-based Toothpastes do NOT whiten teeth and may lead to tooth decay as dentists warn the products are reliant on 'marketing gimmicks and folklore," DailyMail (May 9, 2019), [https://www.dailymail.co.uk/health/article-7010219/Charcoal-based-toothpastes-NOT-whiten-teeth.html].

Dr. Ada Cooper, DDS, spokesperson for the American Dental Association, warned of charcoal toothpastes in *Beware Whitening Promise of Charcoal Toothpastes* in March 2019: "Just because something is popular doesn't mean it's safe." "Charcoal is recognized as an abrasive material to teeth and gums." "Using materials that are too abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[101]

116.     It is entirely implausible that Defendant, a multinational company that possessed particularly sophisticated marketing savvy and invested significant time, money and effort into the marketing of its products, failed to notice reported concerns from the ADA and other dental professionals and experts, researchers within the scientific community, and the media that the safety and efficacy of charcoal dentifrices were wholly unsubstantiated, and their use was highly risky to consumers' oral health, dental hygiene and aesthetics. (Unlike consumers, whose attention to the claims of the oral care industry will likely be limited to time in a shopping aisle looking at product packaging, or at online retail sites that present a company's marketing claims.)

117.     Crest's awareness that its claims were scientifically or medically unsubstantiated can also, arguably, be inferred from what it does *not* say on its website: that it has done third-party testing of its Charcoal Toothpastes.[102]

118.     Dentistry journals and publications (going as far back to a 1932 JADA report) have also reported on the dangers of charcoal dentifrices ,[103] and should cause any responsible oral care business to seriously evaluate the safety and effectiveness of its product. Indeed, Crest

---

[101]     The Family Dental Center, Mar. 2019, "Beware Whitening Promise of Charcoal Toothpastes," [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

[102]     "We observed that activated charcoal was more abrasive than a whitening toothpaste on acrylic resins. . . ." Brantley McCarthy et al., "Activated Charcoal as a Whitening Dentifrice," Academy of General Dentistry 2015 Annual Meeting (June 18-21, 2015) [https://www.epostersonline.com/agd2015/node/72].

[103]     John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).

was under a continuing duty to warn if its product poses a risk, and its duty could be triggered by new information.

**G.     Crest's False and Misleading Claims and Omissions are Material**

119.    The claims at issue – which are alleged herein as misleading, inaccurate, and/or false, as well as lacking a proper factual basis and required evidentiary substantiation – are material to a consumer's decision whether to purchase them as well as how much to pay for them.

120.    Crest's claims and omissions were materially misleading, in that they are likely to deceive a reasonable consumer and also directly concern unique and intrinsic qualities of the products, and caused an increase in consumers' perception of their value as compared to other products on the market.

121.    The misrepresentations and omissions in Crest's labeling, marketing and advertising that are challenged herein are also material in that they also have potentially serious consequences on consumers' oral health and dental hygiene, simply as a result of the intended use.

122.    Crest's cosmetic, safety and other claims concerning activated charcoal and the Charcoal Toothpastes are important to a consumer's purchasing decision and concern the effectiveness and safety and other intrinsic properties and qualities of the products, and drive straight to the reason a consumer would purchase them and assign value to them. Crest negligently, recklessly and/or intentionally fails to disclose material information that, if known to a consumer, would inform the consumer's perception of the claims affirmatively made, and would affect the purchase decision.

**H.     Crest Intended Consumers' Reliance and Induced Consumers' Purchase of the Charcoal Toothpastes**

123. Crest's advertising and marketing scheme was constructed in order to induce consumers to purchase the Charcoal Toothpastes over other products, and to do so at a price premium.

124. Crest sought to instill consumer trust and confidence with terms like "gently cleanses", "enamel safe" and "whitening".

125. Crest charges more for its Charcoal Toothpastes than it does for its other non-charcoal toothpastes. On Target.com, Crest's 3D White Whitening Toothpaste is $6.99 per 4.1-ounce tube, and Crest's 3D White Stain Eraser Whitening Toothpaste is $2.99 for a 3.5-ounce tube.

126. Crest negligently continues to promote and hype the (unsubstantiated) attributes of activated charcoal. It does so despite warnings from dentists and the scientific community about charcoal dentifrices – at best a "marketing gimmick" and, at worst, harmful to teeth, dentistry implants and overall oral health.

127. Crest's misleading claims, material omissions, and its false and deceptive marketing campaign as a whole, are materially misleading and likely to deceive (and have deceived) consumers, and are intended to induce reliance and the purchase of one or more of the Charcoal Toothpastes.

**J.      Consumers' Reliance was Reasonable and Justified**

128. Each and every purchaser of the Charcoal Toothpastes, including Plaintiffs and putative Class members, were exposed to Defendant's claims. In addition to online and print marketing and ads, the claims are printed on external cardboard packaging and product labeling, including on the toothpaste tubes.

45

129.    Consumers reasonably relied on the oft-repeated claims that the Charcoal Toothpastes had safe whitening and detoxifying properties, as well as other dental hygiene and cosmetic benefits, and that they were generally as effective, appropriate, and adequate for dental hygiene maintenance and, at least not harmful in their intended use.

130.    An average consumer lacked any reasonable or meaningful ability to test or practicably verify Crest's claims. Consumers cannot reasonably be expected to research and independently ascertain the truthfulness of the claims made by the sellers they pay for products.

131.    This is particularly so in the purchase of a dental product from an oral care company, which is owned by a multinational company, and consumers may reasonably rely upon the expertise of an oral care company that introduces a dental product to the retail market and presents it as safe for long-term daily use, effective and adequate to meet dental hygiene and oral care maintenance needs. Reasonable and typical consumers lack sufficient training to discern the validity of such claims, which require a certain level of expertise and specialized knowledge; nor should consumers be reasonably expected to feel the need to question or investigate these types of claims.

132.    Consumers relied on Crest's claims and were induced to believe that the Charcoal Toothpastes provide properties, qualities and safety benefits that other 'retail' toothpastes do not. Unfortunately they paid a price, in economic injury as well as potential non-economic consequences.

### K.    Crest's Wrongful Conduct Injured Consumers

133.    The named Plaintiffs, putative Class members, and consumers at large have been harmed by Crest's false, misleading and negligent representations because they purchased the Charcoal Toothpastes that were not as represented, in that they did not provide the promised

benefits, properties, and characteristics, as well as a level of safety. They were also ineffective as dentifrice and/or harmful.

134.    Plaintiffs and putative Class members, as well as consumers at large, suffered injuries in fact and ascertainable losses. This came in the form of out-of-pocket economic loss, and the failure to receive the benefit of the bargain.

135.    Plaintiff and purported class members also paid a premium price for the mislabeled and falsely advertised products, and such premium can be directly and clearly tied to the inclusion of the activated charcoal ingredient, and the hyped marketing claims Crest made about its attributes. The premium would not have been paid but-for Crest's misrepresentations and omissions on the unproven and potentially harmful ingredient - charcoal.[104]

136.    Consumers (including the named Plaintiffs) would not have paid premium prices for the Charcoal Toothpastes or even purchased them at all, but-for Crest's representations on the attributes of activated charcoal and the benefits of its products could safely deliver.

137.    Moreover, had Crest revealed that charcoal in its dentifrice is highly abrasive, carries significant risks, and/or even that Crest lacked the substantiation it was required to possess for its claims, then reasonable consumers, who had been drawn in by Crest's marketing tactics, would have had cause to refrain from purchasing as well as using the Charcoal Toothpastes. In light of Crest's marketing content, even were the charcoal ingredient as implemented in Crest's particular formula for its Charcoal Toothpastes not ultimately proven to be categorically unsafe, the lack of substantiation and potential for risk would have deterred a

---

[104]    Each consumer has been exposed to the same or substantially similar misleading and unlawful practices and each product contains identical or substantially similar claims, and each of the Charcoal Toothpastes were sold at a price premium. As such, each consumer suffered the same or substantially similar injuries as the named Plaintiffs, irrespective of which particular Charcoal Toothpaste they purchased.

reasonable consumer purchasing (at a premium) what they reasonably believed to be very safe, healthy, natural, and free of any potentially harmful ingredients.

138.    These products were not as represented and cannot deliver the promised health, dental hygiene, and cosmetic benefits, as previously discussed. For example, Crest had no reasonable factual basis for claiming any oral health benefits delivered in the form of purported detoxifying properties of charcoal. The promised performance and benefits simply were not, and could not have been, realized.

139.    The Charcoal Toothpastes were sold at a price premium of $1 to $2 per tube for a toothpaste with the unproven, potentially harmful ingredient, over the toothpastes sold by Crest that do not contain charcoal.

140.    In addition to the economic injury in the form of a price premium paid for falsely promised benefits, consumers have been damaged by the total purchase price, because they purchased a dentifrice that does not provide the basic safety and oral health maintenance that otherwise similar non-charcoal dentifrices do.

141.    The consumer is harmed in a second way that is distinct from, and in addition to, the $1 to $2 price premium paid for nonexistent benefits of activated charcoal. Not only do Crest's Charcoal Toothpastes not bring an additional benefit for the $1 to $2 premium (in the form of purported detox or whitening), they also may not provide basic oral hygiene maintenance that would have been provided by other non-charcoal, regular toothpastes containing ingredients that have been substantiated, proven, and/or approved as legitimately safe and effective. Instead, Plaintiff and putative Class members were using oral care products that were deficient and do not meet basic oral health care needs and maintenance.

142. Furthermore, the use of the products carried significant risk due to the inclusion of charcoal.[105]

143. Consumers were damaged by the entire cost of a tube of toothpaste that was ineffective at maintenance of oral hygiene and potentially deleterious to oral health.

144. In addition to its trusting consumers, Crest took unfair advantage of its competitors. It conveyed that the Charcoal Toothpastes were of premium, superior quality and had attributes that other commercially available toothpastes do not.

145. Crest has collected substantial profits as a result of numerous material omissions and false and misleading claims over the benefits and safety of activated charcoal in dentifrice and the Charcoal Toothpastes, and other purported attributes that were false and misleading.

146. Defendant had knowledge that its claims lack required substantiation and that the Charcoal Toothpastes do not comport with the representations it has made. It also knew or should have known of the potential for serious harm caused by the use of charcoal in its dentifrices. Defendant's conduct is deceptive, unethical, in violation of public policy, wanton and recklessly indifferent to others, and substantially injurious to consumers as well as to competitors.

147. Defendant should not be permitted to retain its substantial benefit obtained from its injurious misconduct, which in justice and equity belong to Plaintiffs and members of the Class, and caused them injury; nor should it, in justice and equity, be permitted to continue to benefit from its unfair and deceptive practices.

---

[105] For example, they used the Charcoal Toothpastes (which had been represented as, inter alia, safe for gums, natural, healthy and effective for whitening, and non-abrasive to enamel) which were, unbeknownst to them, in fact abrading their enamel rather than safely and naturally whitening their teeth. And, as previously discussed, the inclusion of charcoal particles can directly damage dental implants or the gumline. Charcoal also causes damage that arrives in the form of oral health issues that can arise due to failure to meet basic oral health care needs and maintenance, as well as oral health issues that can spiral as consequences of the abrasive damage caused by charcoal.

148.   Without remedy (including injunctive relief), Plaintiffs, members of the putative

Class, and other consumers, will suffer a concrete harm, in that they cannot be confident that the

labeling of products will be truthful and not misleading when they are making their purchase

decisions in the future. Alternatively, they might mistakenly but reasonably believe that the

labeling and advertising of the products has been substantiated and/or corrected, and be deceived

yet again into purchasing one or more of the products.

## V.   CLASS ACTION ALLEGATIONS

149.   Pursuant to CAFA and the Federal Rules of Civil Procedure 23(a) and (b)(3),

Plaintiffs bring this lawsuit as a Class Action on behalf of themselves and all other similarly

situated members of the classes, as defined below. This Class Action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements of those

provisions.

The proposed "**Nationwide Class**" is defined, subject to timely amendment following

discovery, as follows:

> All individuals who purchased one or more of Crest's Charcoal Toothpastes[106]
> for personal, family or household use within the United States within the
> applicable statute of limitations.

The proposed "**FL Subclass**" is defined, subject to timely amendment following

discovery, as follows:

> All individuals who purchased one or more of Crest's Charcoal Toothpastes[107]
> for personal, family or household use within the state of Florida within the
> applicable statute of limitations.

The proposed "**MA Subclass**" is defined, subject to timely amendment following

discovery, as follows:

---

[106]   As previously defined herein.
[107]   As previously defined herein.

All individuals who purchased one or more of Crest's's Charcoal Toothpastes[108] for personal, family or household use within the Commonwealth of Massachusetts within the applicable statute of limitations.

150. Members of the proposed Class and Subclasses (and any other alternative subclasses that may be proposed) are collectively referred to herein as the "Class members."

151. Excluded from the Class are: (1) Defendant and its subsidiaries, affiliates, employees, officers, directors, assigns, and successors, as well as any entities or divisions in which any of the Defendants have a controlling interest; (2) the Judge to whom this case is assigned to and any member of the Judge's immediate family; (3) the Magistrate Judge to whom this case is assigned and any member of the Magistrate Judge's immediate family; and (4) anyone asserting claims for personal injury in connection with the Crest Charcoal Toothpastes. Plaintiffs reserve the right to amend the definition of the Class if discovery and/or further investigation reveal that the Class should be expanded or otherwise modified.

152. **Numerosity**: The exact number of Class members is presently unknown, and can only be ascertained through appropriate discovery. However, Plaintiffs reasonably estimate that the Nationwide Class consist of thousands or tens of thousands of members. The expected numerosity of Class is such that joinder of all members is impracticable. Moreover, the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court, including in terms of practicability and manageability. The Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

153. **Commonality and Predominance**: Common questions of law and fact exist as to all members of e the Class and predominate over questions affecting only individual members. Defendant engaged in a common course of conduct giving rise to the legal claims as to Plaintiffs

---

[108]     As previously defined herein.

themselves as well as to the other putative members of the Class, all of whom were damaged by the identical common law violations, business practices, and misconduct. For example, consumers were exposed to the same or substantially similar set of misrepresentations and omissions and packaging, labeling, and marketing; manifested a similar kind and degree of reliance; and also suffered substantially similar injuries. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

154. These common questions predominate over any questions affecting only individual members of the Class and include, but are not limited to, the following:

a. Whether, in its product packaging, labeling, marketing, advertising, and/or sale of the Charcoal Toothpastes, Defendant made materially misleading representations and material omissions;

b. Whether Defendant made and breached an express warranty to the named Plaintiffs and the Class;

c. Whether Defendant breached the implied warranty of merchantability;

d. Whether Defendant's false and misleading statements concerning the Charcoal Toothpastes and their concealment of material facts concerning the Charcoal Toothpastes were likely to deceive reasonable consumers;

e. Whether Plaintiffs and the Class members suffered an ascertainable loss or actual injury;

f. Whether misrepresentations on the Charcoal Toothpastes caused Plaintiffs and the Class members to pay a higher price than they otherwise would;

g. Whether the acts and omissions of Defendant violated enumerated state consumer protection statutes and/or deceptive acts and practices statutes in effect in the various States;

h. Whether Plaintiffs and the Class members are entitled to injunctive relief;

i. Whether Defendant was unjustly enriched by the sale of the Charcoal Toothpastes and the profits earned therefrom should be disgorged; and

        j.       Whether the actions of Defendant warrant punitive damages.

155.   **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Class, as Plaintiffs and all members of the Class purchased Crest's Charcoal Toothpastes after exposure to, and reliance upon, the same material misrepresentations and/or omissions reflected in the claims appearing on the product packaging and labeling, on Defendant's websites, Defendant's Amazon.com listing, other online retail platforms, and/or other forms of advertising and marketing. Plaintiffs and Class members have suffered the same or substantially similar injuries as a result, in that they were damaged by the common thread of Defendant's misconduct and incurred expenses based on their reliance thereon.

156.   Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent members of the Class. As alleged above, each consumer has been exposed to the same or substantially similar deceptive practices regardless of which of the Charcoal Toothpastes they purchased because: 1) identical or substantially similar claims are made as to each product regarding the benefits of activated charcoal, and each product was labeled and/or promoted in marketing and advertising with the same or substantially similar claims and omissions; and 2) the inclusion of activated charcoal in each product gives rise to the harms described herein and raises the same set of concerns.

157.   **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel highly experienced in prosecuting consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of members of the Class, and have the resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

158. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the relatively small size of the claims of the individual members of the Class, absent a class action, most members would likely find the cost of litigating their claims against Defendant to be prohibitive or impractical. A class action, on the other hand, offers the possibility for effective redressability. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the time and resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The class action device presents no management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

159. **Ascertainability and Notice**: The proposed Class is defined with reference to objective criteria. A reliable and administratively feasible mechanism exists for the determination of membership of the proposed Class. Plaintiffs and their counsel anticipate that notice to the proposed Class members will be effectuated through recognized, Court-approved notice dissemination methods, which may include the United States mail, electronic mail, internet postings, and/or other published notice.

## VI.   CAUSES OF ACTION

### COUNT ONE
#### *Nationwide Class*
#### Breach of Express Warranty

160. Plaintiffs re-assert and reference the allegations made heretofore in this Complaint, and incorporate as if fully set forth herein.

161.    Plaintiffs bring this claim under Article 2 of the Uniform Commercial Code (the "UCC") as adopted and codified under state statutes, and do so on behalf of themselves and the members of the Nationwide Class.

162.    Under Section 2-313 of the UCC, as codified by the states, affirmation of fact or promise made by the seller to the buyer, which relate to the goods and are a basis of the bargain, create an express warranty that the goods shall conform to the affirmation or promise.

163.    In connection with the sale of the Charcoal Toothpastes, Defendant issued written express warranties concerning the Charcoal Toothpastes. Express warranties concerning the Charcoal Toothpastes included, but were not limited to:

"whitening"

"enamel safe"

"gentle clean"

"gently cleans & removes stains"

"Charcoal Pro-Health Gum Detoxify Charcoal Toothpaste has a unique and ativated [sic] foam formula with charcoal that penetrates hard to reach places to neutralize harmful plaque bacteria even around the gum line"

"deep clean with charcoal for your teeth!"

"toothpaste with charcoal gently whitens teeth by removing surface stains"

"whitens your teeth by removing up to 80% of surface stains and protects against future stains thanks to the active polishing crystals"

"active stain prevention"

"charcoal formula brightens teeth by removing surface stains"

"deeply cleans & removes stains"

55

"gently whitens teeth"

"Purifies Teeth Surface for a Whiter, Cleaner Smile"

"This formula gives you a deep clean that brightens teeth, strengthens enamel and freshens breath"

164.    Defendant's affirmations of fact or promise were made to the Plaintiffs and members of the Class on the product packaging and labeling of the Charcoal Toothpastes, on Crest's website, and in other online retail sites and digital and print advertising.

165.    These affirmations of fact or promise were material and became part of the basis of the bargain between the Defendant on the one hand, and the Plaintiffs and Class members on the other, thereby creating express warranties that the Charcoal Toothpastes would conform to such affirmations of fact and promise.

166.    Plaintiffs and the Class members were in direct privity with Defendant and/or its agents or third-party retailers, or were intended third-party beneficiaries of the warranties breached hereto the extent required by law.

167.    The Charcoal Toothpastes were purchased by Plaintiffs and Class members via a third-party retailer in which Plaintiffs and Class members were the intended third-party beneficiaries of the contract between Defendant and its third-party retailers. Indeed, Crest's website has a link next to all its Charcoal Toothpastes entitled "buy now," which will take consumers to various third-party retailers' websites to purchase the Charcoal Toothpastes.

168.    The inclusion of the "buy now" link underscores the existence of a valid and binding contract between Crest and third-party retailers, and that this contract was intended for Plaintiffs' and Class members' benefit, and that the benefit to Plaintiffs and Class Members is immediate: if Plaintiffs and Class members click on the link on Crest's website, it will take them

56

to third-party retailers' sites to purchase the exact Charcoal Toothpaste as promised. The inclusion of the "buy now" link shows that Crest and its third-party retailers intend for consumers to rely on the link.

169. Plaintiffs and Class members reasonably and justifiably relied on the Defendant's express warranties, believing that the Charcoal Toothpastes they purchased would conform to the express warranties.

170. Defendant breached its express warranties because the Charcoal Toothpastes do not, in fact, conform to the affirmations of fact or promise, and the Charcoal Toothpastes do not perform as expressly warranted. They did not so perform for Plaintiffs, and they cannot perform.

171. In fact, no reliable, scientifically sound studies have demonstrated any of the benefits of activated charcoal or the Charcoal Toothpastes as represented by Defendant to be substantiated, and there is no substantiation of their safety or efficacy. Activated charcoal has never been proven effective and safe for use in dentifrices generally or for the particular claims made by Defendant.

172. Plaintiffs and the Class members were injured as a direct and proximate result of Defendant's breach because Plaintiffs and the Class members did not receive the benefit of the bargain, as the Charcoal Toothpastes did not have the promised benefits, effectiveness, safety, value or other properties as represented. The Plaintiffs and the Class members suffered injuries because, had they known the true facts, they would not have purchased the Charcoal Toothpastes, as compared to similar products that did conform as warranted and represented.

173. Within a reasonable time after they knew of Defendant's warranty breaches, Plaintiffs, on behalf of themselves and Class members, placed Defendant on notice of its breach and gave it opportunity to cure, with the filing of this Complaint.

174.     Plaintiff Durgin also provided Defendant notice of its breach by his letter to Defendant dated January 13, 2020.

175.     As a direct and proximate result of Defendant's breaches of express warranty, Plaintiffs and the Class members have been damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold, in an amount to be proven at trial, together with interest thereon from the date of purchase.

**COUNT TWO**
*Nationwide Class*
**Implied Warranty of Merchantability**

176.     Plaintiffs re-assert and reference the allegations made heretofore in this Complaint, and incorporate as if fully set forth herein.

177.     Plaintiffs bring this claim under Article 2 of the UCC as adopted and codified under state statutes, and do so on behalf of themselves and the members of the Nationwide Class.

178.     Under Section 2-314 of the UCC, as codified by the states, a warranty that goods shall be merchantable is implied in the contract for their sale, if the seller is a merchant with respect to goods of that kind. To be considered merchantable, the good must be safe and fit for the intended use, and conform to the promise or affirmations of fact made on the label or packaging.

179.     In this case, Defendant qualifies as a merchant, and a warranty of merchantability was implied in the sale of the Charcoal Toothpastes to the Plaintiffs and Class members. Defendant, directly through its website and/or by and through its storefront on Amazon and/or through contractual arrangements with online retailers and other third-parties, sold the Charcoal Toothpastes clearly labeled as having certain characteristics. Defendant knew the use for which

the Charcoal Toothpastes were intended, and impliedly warranted them to be of merchantable quality, safe, and fit for use.

180.    Plaintiffs and the Class members were in direct privity with Defendant and/or its agents or third-party retailers, or were intended third-party beneficiaries of the implied warranties breached hereto the extent required by law.

181.    The Charcoal Toothpastes were purchased by Plaintiffs and Class members via a third-party retailer in which Plaintiff and Class members were the intended third-party beneficiaries of the contract between Defendant and its third-party retailers. Indeed, Crest's website has a link next to all its Charcoal Toothpastes entitled "buy now," which will take consumers to various third-party retailers' websites to purchase the Charcoal Toothpastes.

182.    The inclusion of the "buy now" link underscores the existence of a valid and binding contract between Crest and third-party retailers, and that this contract was intended for Plaintiffs' and Class members' benefit, and that the benefit to Plaintiffs and Class Members is immediate: if Plaintiffs and Class members click on the link on Crest's website, it will take them to third-party retailers' sites to purchase the exact Charcoal Toothpaste as promised. The inclusion of the "buy now" link shows that Crest and its third-party retailers intend for consumers to rely on the link.

183.    With each sale of falsely labeled Charcoal Toothpastes to the Plaintiffs and Class members, Defendant has breached the implied warranty of merchantability.

184.    Plaintiffs and Class members reasonably relied on Defendant's affirmations, as well as the projected trustworthiness of the company. Had the Plaintiffs and Class members known of the true nature of the Charcoal Toothpastes and that they were not of merchantable quality, not a minimum level of quality, not safe or fit for their intended use, and not in

conformance with the Defendant's representations, they would not have purchased them, or they would not have been willing to pay the inflated price.

185.    Defendant is on notice of its breach pursuant to the initiation of this action and the letter sent by Plaintiff Durgin to Defendant on January 13, 2020.

186.    As a direct and proximate result of Defendant's breaches of the implied warranty of merchantability, Plaintiffs and the Class members have been damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold, in an amount to be determined at trial, together with interest thereon from the date of purchase.

**COUNT THREE**
***Nationwide Class***
**Negligent Misrepresentation**

187.    Plaintiffs re-assert and reference the allegations made heretofore in this Complaint, and incorporate as if fully set forth herein.

188.    Plaintiffs bring this Count on behalf of themselves and on behalf of the members of the Nationwide Class.

189.    Defendant, through its labeling, advertising, and marketing of the Charcoal Toothpastes, made uniform, false representations and claims regarding activated charcoal and the products, as previously described above.

190.    Defendant had a duty to provide a non-deceptive and lawful description of the benefits, safety, effectiveness, true value and other properties of the Charcoal Toothpastes, and to not conduct itself in contravention of public policy.

191.    Defendant had statutory duties as to the product labeling and advertising claims on its Charcoal Toothpastes, which included being truthful and not misleading, to have a

reasonable basis and proper substantiation for the claims made, and to possess such substantiation at a level proportionate to the claimed level of substantiation.

192.    Defendant held itself out to the Plaintiffs, Class members, and consumers at large as a brand to be trusted and that was possessive of special knowledge and expertise concerning the safety and efficacy of the Charcoal Toothpastes as well as of the safety and other qualities of activated charcoal for use in dentifrices, and of oral health and dental hygiene maintenance in general. The average consumer lacks scientific or medical background necessary to carefully assess and truly evaluate Crest's assertions before purchase, and would have had to place their trust in the brand. Meanwhile, Crest was in a unique position to know the safety and efficacy of its own products, of the veracity of its claims and of its critical omissions and the lack of substantiation.

193.    Plaintiffs and the Class members were in direct privity with Defendant and/or its agents or third-party retailers, or were intended third-party beneficiaries, given the nature between Plaintiffs and the Class members' status as consumers of the Charcoal Toothpastes, and the ability of Defendant to identify most purchasers of the Charcoal Toothpastes.

194.    The Charcoal Toothpastes were purchased by Plaintiffs and Class members via a third-party retailer in which Plaintiffs and Class members were the intended third-party beneficiaries of the contract between Defendant and its third-party retailers. Indeed, Crest's website has a link next to all its Charcoal Toothpastes entitled "buy now," which will take consumers to various third-party retailers' websites to purchase the Charcoal Toothpastes.

195.    The inclusion of the "buy now" link underscores the existence of a valid and binding contract between Crest and third-party retailers, and that this contract was intended for Plaintiffs' and Class members' benefit, and that the benefit to Plaintiffs and Class Members is

immediate: if Plaintiffs and Class members click on the link on Crest's website, it will take them to third-party retailers' sites to purchase the exact Charcoal Toothpaste as promised. The inclusion of the "buy now" link shows that Crest and its third-party retailers intend for consumers to rely on the link.

196.    By the special nature of its products, and by its own conduct inducing reliance on its specialized knowledge, Crest was under a duty to impart correct information to Plaintiffs and Class members as well as consumers at large.

197.    Defendant owed a duty of care to the Plaintiffs and Class members to give appropriate warnings about all dangers and risks associated with the intended use of the Charcoal Toothpastes, of which Defendant was aware or should have been aware. Defendant was under a continuing duty to warn and instruct the intended and foreseeable consumers of the Charcoal Toothpastes, including Plaintiffs and the Class members, of the same. Defendant was negligent and breached its duty of care by negligently failing to give adequate disclosures and warnings. Defendant knew that Plaintiffs and the Class members could not reasonably be aware of these risks.

198.    Defendant also had a duty to correct the misinformation it disseminated through its advertising of the Charcoal Toothpastes. By not informing Plaintiffs and the Class members, Defendant breached this duty.

199.    Defendant gained financially from, and as a result of the breach of its duties aforementioned, including the one to correct misinformation.

200.    The aforementioned misrepresentations, omissions and other deceptions concern material facts that are essential to the analysis undertaken by Plaintiffs and Class members in deciding whether to purchase one or more of Defendant's Charcoal Toothpastes.

201.    However, the information conveyed was not correct and was materially misleading and deceptive. For example, the findings of a controlled scientific study, published in a 2017 article, *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, confirmed that charcoal-based toothpastes are more abrasive and affecting on the surface roughness on a tooth as compared to other non-charcoal whitening toothpastes.[109]

202.    Plaintiffs and Class members reasonably and justifiably relied upon the Defendant's representations and omissions, which were in violation of Defendant's duties.

203.    But-for Defendant's misleading, deceptive and/or fraudulent acts, representations and omissions, Plaintiffs and the Class members would not have been misled and would not have been induced to pay out-of-pocket money for one or more of the Charcoal Toothpastes; or alternatively they would not have paid a price premium for the Charcoal Toothpastes.

204.    As a direct and proximate result of Defendant's wrongful conduct and breach of its duties, Plaintiffs and Class members have suffered and continue to suffer injury, including but not limited to the amounts paid for the Charcoal Toothpastes, which were worth much less than represented, could not and did not function as represented, and brought potentially damaging consequences with their intended use. Plaintiffs pray for relief as set forth below.

**COUNT FOUR**
***Nationwide Class***
**Intentional Misrepresentation**

205.    Plaintiffs re-assert and reference the allegations made heretofore in this Complaint, and incorporate as if fully set forth herein.

206.    Plaintiffs bring this Count on behalf of themselves and on behalf of the members of the Nationwide Class.

---

[109]    U I Pertiwi et al., *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, IOP Conf. Series: Journal of Physics: IOP Conf. Series 884 (2017) [iopscience.iop.org] (doi:10.1088/1742-6596/884/1/012002).

207.    Defendant has represented to the public, including Plaintiffs, by promoting, marketing, advertising, packaging, labeling, and other means, that the Charcoal Toothpastes have characteristics and qualities that they do not have. These representations were material, and were uniformly made.

208.    Defendant, through its labeling, advertising, and marketing of the Charcoal Toothpastes, made uniform representations and claims regarding the products, as previously described above. Defendant engaged in, and continues to engage in, such misleading, false, deceptive and/or fraudulent conduct with full knowledge that such acts were, and are, misleading, false, deceptive and/or fraudulent.

209.    At the time Defendant made the representations alleged herein, Defendant knew the representations were false and/or made them with fraudulent intent.

210.    Defendant understood that the content of its labeling, packaging and website, and all its marketing and branding, would be used by and relied upon by consumers for the purpose of evaluating the Charcoal Toothpastes in comparison to other brands of dentifrices on the market.

211.    Defendant knew that the consumers to whom it was directly marketing lacked the scientific or medical background necessary to carefully assess and truly evaluate Crest's assertions before purchase, and would have to place their trust in the representations.

212.    The information was materially false, deceptive and misleading, as previously discussed and alleged herein. For example, the findings of a controlled scientific study, published in a 2017 article, *Surface Changes of Enamel After Brushing with Charcoal*

*Toothpaste*, confirmed that charcoal-based toothpastes are more abrasive and affecting on the surface roughness on a tooth as compared to other non-charcoal whitening toothpastes.[110]

213.    Defendant made the misrepresentations herein with the intention of depriving Plaintiffs and other Class members of property or otherwise causing injury, and thus, Defendant has committed fraud.

214.    Defendant's deceptive or fraudulent intent may be inferred by allegations and evidence of motive and opportunity, as well as strong circumstantial evidence of conscious misbehavior or recklessness. In the instant case, the allegations previously asserted herein that support scienter include but are not limited: the scientific journals that contradict, refute or call into question Crest's claims, of which it must have been aware (in light of the industry and media reports on the same, as well as consumer complaints); Crest's intentional selectivity in choosing which products to subject to clinical testing; Crest's apparent selective submission to the ADA Seal Program to omit any charcoal products. Defendant knew that consumers would place trust and confidence in its product claims and rely thereon in their purchase of the products. In addition to Crest's inferred awareness that its claims were unsubstantiated and the products were potentially unsafe, Defendant expressly represented safety as well as superiority to other products, and also generated great profit by instilling confidence in its consumer base that its claims were credible; as such, Defendant's motive and opportunity to deceive, and access to accurate information is further strong circumstantial evidence.

215.    Defendant made misleading and false representations between 2019 and present day to Plaintiffs and Class members via its online marketing and advertising and product packaging. In its product packaging, labeling, marketing and advertising, Defendant made false

---

[110]    U I Pertiwi et al., *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, IOP Conf. Series: Journal of Physics: IOP Conf. Series 884 (2017) [iopscience.iop.org] (doi:10.1088/1742-6596/884/1/012002).

and misleading representations and material omissions to Plaintiffs and the members of the Class, and/or omitted the disclosure of material facts. Defendant knew or should have known the representations and omissions rendered its claims on the Charcoal Products false or misleading. Defendant acted without reasonable grounds for believing the representations were true, and intended that said representations induce reliance of the Plaintiffs and the Class members.

216.    Crest went beyond non-disclosure of its lack of claim substantiation, and expressly represented the Charcoal Products' safety and health attributes. Defendant's marketing messaging was heavy-handed and affirmatively intimated that substantiation for its claims did in fact exist. Defendant intentionally induced not only justifiable reliance by consumers but also their trust and confidence. Crest made many claims it knew were false or misleading and that it knew average consumers were unequipped to assess, and in which it knew consumers would place trust and would rely upon.

217.    Plaintiffs and other Class members believed and relied on Defendant's promoting, marketing, advertising, packaging, and labeling of the Charcoal Toothpastes, and, in justifiable reliance thereon, purchased and used them.

218.    Defendant acted with an intent to defraud, or with reckless or negligent disregard of the rights of, Plaintiffs and the Class members.

219.    As a proximate result of these acts and omissions, Plaintiffs and Class members were induced to spend money on the Charcoal Toothpastes and they were damaged in the economic loss of money spent (in an amount to be determined at trial) on the Charcoal Toothpastes that were not as represented, and that were not worth the full value paid, and which Plaintiffs and the Class members would not have purchased, or would have paid less for, but-for the misrepresentations and material omissions.

220.    Additionally, as a proximate result of these acts and omissions, upon which Plaintiffs and Class members reasonably relied, they also used the Charcoal Toothpastes to their damage, as they were unaware of the risks (including the abrasivity) and lack of substantiation for efficacy, safety as well as adequacy of daily long-term use for dental hygiene and oral health maintenance. The Charcoal Toothpastes contain charcoal, which is known to be abrasive and capable of causing damage to the enamel and gums, and to cause sensitivity and aesthetic issues.

221.    Plaintiffs pray for relief as set forth below.

**COUNT FIVE**
*Nationwide Class*
**Unjust Enrichment**

222.    Plaintiffs re-assert and reference the allegations made heretofore in this Complaint, and incorporate as if fully set forth herein.

223.    Plaintiffs bring this Count on behalf of themselves and on behalf of the members of the Nationwide Class.

224.    "The unjust enrichment claim can be made from common class wide proof." *Westways World Travel, Inc. v. AMR Corp.,* 218 F.R.D. 223, 239 (C.D. Cal. 2003) (certifying a nationwide class where plaintiffs alleged defendants were unjustly enriched through a common scheme). "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's laws are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid*

67

*Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009), quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007).

225.    Plaintiffs and the Class members conferred a benefit on Defendant by purchasing the Charcoal Toothpastes.

226.    Defendant has been unjustly enriched in retaining the revenues derived from Class members' purchases of the Charcoal Toothpastes. Retention of said revenues, under these circumstances, is unjust and inequitable because Defendant misrepresented the facts concerning the efficacy and safety of the Charcoal Toothpastes, made material omissions, and employed deceptive and misleading labeling, advertising, marketing and sales practices, and caused the Plaintiffs and Class members to lose money as result thereof.

227.    Plaintiffs and the Class members were injured as a direct and proximate result of Defendant's breach and unlawful conduct, because they would not have purchased the Charcoal Toothpastes if the true facts had been known.

228.    This claim is not merely duplicative of the other conventional causes of action asserted by Plaintiffs herein. Rather, it is asserted as an alternative and/or distinct set of elements and theory of recovery, those which establish circumstances so as to create an equitable obligation running from Defendant to the Plaintiffs and the Class members. The basis of unjust enrichment is not limited only to the standard false-advertising claims, but also to the inherent unsafety and risk of the Charcoal Toothpastes.

229.    As a result of Crest's deceptive, fraudulent and misleading labeling, advertising, marketing and sales of the Charcoal Toothpastes, its material representations and omissions, and other wrongful conduct, Crest has been unjustly enriched by it sales of the Charcoal Toothpastes. It has financially benefitted through its use of false advertising and other deceptive and wrongful

practices, and at the expense of Plaintiffs and other members of the Class, through the purchase price payments for Charcoal Toothpastes. The Charcoal Toothpastes did not have the benefits, safety, effectiveness, properties, value, and other qualities that Crest represented them to have and brought unknown risks and detriment with their intended use, some of which was not discernable or discerned by Plaintiffs or the average reasonable consumer.

230.     Because the Charcoal Toothpastes were not as Crest purported them to be, it is inequitable and unjust to permit Crest to retain its ill-gotten financial benefits from the sale of the Charcoal Toothpastes. Therefore, as required by equity and good conscience, Plaintiffs and the Class members are entitled to and seek disgorgement and restitution of such financial benefits, as set forth below.

**COUNT SIX**
***FL Subclass***
**Violations of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. Ann. § 501.201, *et seq.***

231.     Plaintiffs re-assert and reference the allegations in this Class Action Complaint, and incorporate as if fully set forth herein.

232.     Plaintiff Parks brings this Count individually on behalf of herself, and on behalf of the FL Subclass.

233.     Defendant's acts, omissions, and practices described herein are in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

234.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

235.     The FDUTPA is to be "construed liberally to promote" its stated purposes, including to "make state consumer protection and enforcement consistent with established

policies of federal law relating to consumer protection. Fla. Stat. § 501.202(3). In construing the

FDUTPA, "due consideration and great weight shall be given to the interpretation of the Federal

Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission

Act, 15 U.S.C. § 45(a)(1)." Fla. Stat § 501.204(2).

236. Defendant has engaged in a pattern of business practices that are unfair,

deceptive, unconscionable and anti-competitive, and that affected Plaintiff Parks and members of

the Florida Subclass, in violation of the FDUTPA. Defendant's conduct also violates other laws,

rules and regulations that protect consumers and/or prohibit unfair methods of competition,

unfair or deceptive acts or practices, and such violations constitute *per se* violations of the

FDUTPA. Fla. Stat § 501.203(3).

237. Plaintiff Parks is a "consumer" within the meaning of the FDUTPA. Fla. Stat. §

501.203(7).

238. Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. §

501.203(8).

239. Defendant's unlawful acts and practices include, but are not limited to, its

misrepresentations and deceptive claims that the Charcoal Toothpastes are or can (i) create

whitening; (ii) deeply clean; (iii) freshen breath; (iv) remove surface stains; (v) gentle; (vi)

enamel safe; (vii) prevent cavities; (viii) purify[y] teeth surface for a whiter, cleaner smile; (ix)

help prevent cavities; (x) strengthen enamel; (xi) gentle clean; (xii) gently clean & remove

stains; (xiii) deep clean with charcoal for your teeth!; and (xiv) active stain prevention. These

misrepresentations and deceptive claims were made by Defendant from 2019-present day to

Plaintiff Parks and Class members online, on television, and on its product packaging.

70

240. Defendant also omitted the disclosure of material facts to consumers concerning the Charcoal Toothpastes, including that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature.

241. Defendant's conduct and practices were likely to deceive a reasonable consumer acting reasonably in the circumstances.

242. Defendant's misrepresentations and omissions and other practices were intended to induce consumers, including Plaintiff Parks and Class members, to purchase the Charcoal Toothpastes.

243. Defendant's conduct constituted unfair and deceptive trade practices in violation of Section 5 of the FTC Act. 15 U.S.C. § 45.

244. Defendant's conduct violated the FTC Act's prohibition against false or misleading advertisements of food, drugs and cosmetics. 15 U.S.C. § 52.

245. Defendant's conduct violated the FD&C Act's prohibition on the marketing and movement in interstate commerce of misbranded cosmetics. 21 U.S.C. § 331.

246. Defendant caused the Charcoal Toothpastes to be misbranded under 21 U.S.C. § 263 and 21 CFR 1.21, and otherwise mislabeled the Charcoal Toothpastes in contravention of federal laws, rules and regulations.

247. Defendant's conduct violated FTC and FDA rules and regulations requiring that Defendant have a reasonable basis and credible, scientific substantiation for the claims and representations it made concerning the Charcoal Toothpastes in the labeling, packaging, advertisements and marketing of the Charcoal Toothpastes.

248.     Defendant failed to provide a warning to consumers that it lacked adequate substantiation of its claims, and/or to warn of the risk and potential harm from use of its products, in violation of federal rules and regulations including 21 CFR 740.10.

249.     Defendant knew or should have known that its conduct was unfair or deceptive, and/or prohibited by rule.

250.     As a direct and proximate result of Defendant's statutory violations and deceptive, misleading and unfair practices, Plaintiff Parks and the members of the Classes have been aggrieved, injured and suffered damages in the amount of the purchase price(s) of the Charcoal Toothpastes they purchased and/or the price premium paid.

251.     Defendant has engaged in, and continues to engage in, unfair and deceptive practices that offend public policies, and are immoral, unethical, unscrupulous and substantially injurious to consumers. Plaintiff Parks and the Class risk irreparable injury as a result of Defendant's violations of the FDUTPA, and these violations present a continuing risk to Plaintiff Parks, the Class, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest, consumer safety and the competitive market.

252.     Pursuant to Fla. Stat. §§ 501.211(2) and 501.2105, Plaintiff Parks and the Class make claims for damages, attorneys' fees and costs.

253.     Pursuant to Fla. Stat. § 501.211(1), Plaintiff Parks and the Class seek a declaratory judgment and court order enjoining the wrongful acts and practices of Defendant.

254.     Plaintiff Parks and the Class also seek an order for the restitution and disgorgement of Defendant's ill-gotten gains, and for statutory penalties of $10,000 *per violation* for Defendant's willful violations of the FDUTPA (Fla. Stat. § 501.2075), and for any other just and proper relief available under the FDUTPA.

72

## COUNT SEVEN
### *MA Subclass*
**Unfair and deceptive conduct in violation of M.G. L. c. 93A, §2, *et seq*.**

255.     Plaintiffs re-assert and reference the allegations in this Class Action Complaint,

and incorporate as if fully set forth herein.

256.     Plaintiff Durgin brings this claim on behalf of himself and the Massachusetts

Subclass.

257.     Crest's conduct, as alleged herein, constitutes unfair or deceptive acts or practices

and unfair methods of competition in trade or commerce in violation of M.G.L. c. 93A, § 2 and

the regulations promulgated thereunder by the Massachusetts Attorney General, including,

without limitation, the following:

    (a)     940 C.M.R. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

    (b)     940 C.M.R.§ 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, ha[ve] the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

    (c)     940 C.M.R. §3.05(2) (prohibiting the use of any advertisement "which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale");

    (d)     940 C.M.R. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty");

    (e)     940 C.M.R. § 3.16(2) (providing that it is a violation of c. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction"); and

      (f)     940 C.M.R. § 3.16(3) (providing that an act or practice violates c. 93A, § 2 if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection").

258.    In construing what constitutes unfair or deceptive acts or practices in actions brought under c. 93A, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., § 45(a)(1)), as from time to time amended." M.G.L., c. 93A, § 2(b).

259.    Crest's unlawful conduct includes its false and misleading statements, representations, and depictions in its marketing and advertising of the Charcoal Toothpastes, making claims and statements regarding the Charcoal Toothpastes' ability to effectively  and safely whiten teeth, including the fact that  the word "WHITENING"  is part of the product name, and in particular, for example, statements that the Charcoal Toothpastes: provide a "deep clean that brightens teeth, strengthens enamel, and freshens breath"; "[p]urif[y] teeth surface for whiter, cleaner smile"; "remove up to 80% of surface stains EVEN IN HARD TO REACH PLACES"; and "PREVENT[] FUTURE STAINS."

260.    Such conduct injured Plaintiff Durgin and each of the other Massachusetts Subclass members, in that: (a) they paid more for the falsely advertised Charcoal Toothpastes than they would have paid for the Charcoal Toothpastes absent the false and misleading claims; and (b) they paid more for the Charcoal Toothpastes than they would have paid for comparable oral dentifrices that don't make the claims made by Crest for the Charcoal Toothpastes.

261.    The injury suffered by Plaintiff Durgin and Massachusetts Subclass members, as described in the preceding paragraph, was incurred as a direct and proximate result of Crest's unlawful conduct, as alleged herein.

262.    Crest's unfair or deceptive acts or practices, as alleged herein, were willful or knowing violations of M. G. L. c. 93A, § 2, within the meaning of M. G. L. c. 93A, § 9(3).

263.    Pursuant to M.G.L. c. 93A, §§ 9(3) and 9(4), Plaintiff Durgin and the other members of the Massachusetts Subclass are entitled to recover statutory damages or actual damages, including recovery of double or treble the amount of their actual damages, plus their reasonable attorneys' fees and the costs of this action.

264.    Plaintiff Durgin and the other members of the Massachusetts Subclass are also entitled to injunctive relief in the form of an order directing Crest to cease its false and misleading marketing and advertising, retrieve existing false and misleading labeling, advertising and promotional materials, and publish corrective advertising.

265.    On January 13, 2020, Plaintiff Durgin served Crest with a written demand for relief pursuant to M.G.L., c. 93A, § 9(3) (the "Demand Letter).   Crest failed to make a reasonable offer of relief in response to Plaintiff Durgin's written demand.

**COUNT EIGHT**
*MA Subclass*
**Untrue and Misleading Advertising**
**Violation of M.G. L. c. 266, § 91**

266.    Plaintiffs re-assert and reference the allegations in this Class Action Complaint, and incorporate as if fully set forth herein.

267.    Plaintiff Durgin brings this claim on behalf of himself and the Massachusetts Subclass.

269.    Crest's labeling, advertising, promotion, and marketing of the Charcoal Toothpastes is untrue, deceptive and misleading, in violation of M.G.L. c. 266, § 91.

270.    At all times relevant to this action, Crest knew, or could, upon reasonable investigation, have ascertained that the labeling, advertising, marketing, and promotion of the Charcoal Toothpastes was untrue, deceptive and misleading.

271.    Defendant's untrue, deceptive and misleading labeling, advertising, marketing and promotion of the Charcoal Toothpastes has continued throughout the Class Period and is continuing as of the present date.

272.    As purchasers of the Charcoal Toothpastes who were aggrieved by Crest's untrue and misleading advertising (in that Plaintiff Durgin and the other Massachusetts Subclass members purchased a product that did not conform to the claims and representations made about it by Crest, including claims and representations about the Charcoal Toothpastes' superior whitening ability and about the Charcoal Toothpastes' ability to safely produce the represented results), Plaintiff Durgin is entitled to bring, and brings this class action to seek all available remedies under M.G.L. c. 266, § 91, including injunctive relief.  The injunctive relief would include an order directing Crest to cease its false and misleading marketing and advertising, retrieve existing false and misleading advertising and promotional materials, and publish corrective advertising.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated in the Nationwide Class and State Subclasses, and any other created subclasses, pray for relief as follows:

(a) Certification of this case as a class action, and of the Nationwide Class and State Subclasses as proposed herein (and any other subclasses) under the Federal Rules of

Civil Procedure, designation of the Plaintiffs as representatives of the Class, and appointment of the undersigned counsel as counsel for the Class;

(b) An order enjoining Defendant from making further misrepresentations regarding the Charcoal Toothpastes, including but not limited to statements that the Charcoal Toothpastes:

   a. Safely whiten teeth;

   b. Detoxify;

   c. Are safe and gentle for everyday use;

   d. Are safe for enamel;

   e. Are safer than or superior to other dentifrices; and

   f. Have detoxifying properties that provide dental hygiene, oral health, and cosmetic benefits.

(c) An order requiring Defendant to issue appropriate corrective advertisements and product labeling and packaging, and to retract its prior false and misleading claims and provide required material disclosures;

(d) Restitution, disgorgement, refund and/or return of all monies, revenues and profits obtained by Defendant by means of misleading, deceptive and unlawful acts or practices;

(e) Actual damages in an amount to be determined at trial;

(f) Statutory damages in the maximum amount provided by law;

(g) Multiple damages where applicable;

(h) Punitive damages;

(i) Costs, expenses, and reasonable attorneys' fees pursuant to applicable statutes;

77

(j)  Pre-judgment and post-judgment interest; and

(k) All such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs and the Class hereby demand a jury trial of the claims asserted in this Class

Action Complaint.

Dated: April 13, 2021                                           Respectfully submitted,

                                                                <u>/s/ Brian D. Flick, Esq.   </u>
                                                                Marc E. Dann (0039425)
                                                                Brian D. Flick (0081605)
                                                                DannLaw
                                                                P.O. Box 6031040
                                                                Cleveland, OH 44103
                                                                Phone: (216) 373-0539
                                                                Facsimile: (216) 373-0536
                                                                notices@dannlaw.com

                                                                William B. Federman, OBA #2853*
                                                                FEDERMAN & SHERWOOD
                                                                10205 N. Pennsylvania Ave.
                                                                Oklahoma City, Oklahoma 73120
                                                                (405) 235-1560
                                                                (405) 239-2112 (facsimile)
                                                                wbf@federmanlaw.com

                                                                David Pastor, BBO 391000*
                                                                PASTOR LAW OFFICE, LLP
                                                                63 Atlantic Avenue, 3d Floor
                                                                Boston, Massachusetts 02110
                                                                (617) 742-9700
                                                                (617) 742-9701 (facsimile)
                                                                dpastor@pastorlawoffice.com

                                                                *pro hac vice application forthcoming

                                                                Counsel for Plaintiffs and the Proposed
                                                                Classes